UNITED STATES of America, Appellee,

v.

James E. CORR, III, and Roger Drayer,
Defendants-Appellants.

Nos. 1290, 1291 and 1323, Dockets
76–1115, 76–1116, 76–1117.

United States Court of Appeals,
Second Circuit.

Argued July 23, 1976.

Decided Oct. 22, 1976.

Michael Lesch, New York City (Shea Gould Climenko Kramer & Casey, Richard F. Czaja, New York City, of counsel), for James E. Corr, III.

Joan Goldberg, New York City (Goldberg & Comer, Neal S. Comer, New York City, of counsel), for Roger Drayer.

Ira Lee Sorkin, New York City (Robert B. Fiske, Jr., U. S. Atty., for the S.D.N.Y., New York City, Richard D. Weinberg and John C. Sabetta, New York City, of counsel), for United States of America.

Before WATERMAN and MESKILL, Circuit Judges, and BARTELS, District Judge.*

BARTELS, District Judge:

James E. Corr, III ("Corr") and Roger Drayer ("Drayer") appeal from judgments of convictions entered on March 5, 1976, in the United States District Court for the Southern District of New York, after a six-week trial before the Honorable Edward Weinfeld, United States District Judge, and a jury.

The indictments charged Corr, Drayer and six other defendants, R. Bruce Buschbaum, Barry Drayer, Barry Chajet, Allen Kern, William Murphy and Richard Sobel, with conspiring to violate the federal securities anti-fraud and mail fraud provisions (18 U.S.C. § 371), and with 41 substantive offenses, including the sale of unregistered securities (15 U.S.C. § 77e), securities and mail fraud (15 U.S.C. §§ 77q(a) and 78j(b) and 18 U.S.C. § 1341), filing a false bank loan application (18 U.S.C. § 1014), perjury (18 U.S.C. § 1623) and false statements before the Securities and Exchange Commission (18 U.S.C. § 1001).[1]

By the time of trial Buschbaum, Kern, Chajet and Sobel pled guilty to one of the offenses charged in the indictment and

Murphy pled guilty to a superseding information charging him with fraud in connection with the purchase and sale of securities. Each of these five defendants testified for the Government at the trial which commenced on December 9, 1975. On January 15, 1976, the jury returned guilty verdicts with respect to Corr and Drayer on all counts submitted and a mistrial was granted as to Barry Drayer on January 16, 1976, when the jury was unable to reach a verdict.[2] On March 5, 1976, Judge Weinfeld imposed on the defendants who pled guilty sentences of imprisonment for terms varying from three to six months with the exception of Murphy for whom the execution of sentence was suspended. On the same day Corr was sentenced to two and one-half years imprisonment and fined $10,000[3] and Drayer was sentenced to two years imprisonment pursuant to 18 U.S.C. § 3651, to serve four months with execution of the remainder suspended. We affirm.

## EVIDENCE

Before dealing with the claims on appeal it is necessary to engage in a tedious review of the relevant evidence in order to indicate the scheme, pattern and the roles played by Corr as the principal actor and the supporting cast of various defendants, including Drayer, in the scenario which resulted in the loss of millions of dollars to the investing public and brokerage houses.

Viewed in the most favorable light to the Government, the evidence reveals a conspiracy by Corr and others to manipulate the

---

* Of the Eastern District of New York, sitting by designation.

1. Counts 35 to 42 of the original indictment, 75–CR–803, were dismissed without prejudice prior to trial and thereafter indictment 75–CR–1059 was filed charging Corr with the same count of perjury and eleven counts of making false statements to the SEC, which included the six false statement counts dismissed from the original indictment and five additional counts of false statement. Thereafter indictments 75–CR–803 and 75–CR–1059 were consolidated for trial by Judge Weinfeld. Prior to trial, however, counts 3 and 5 of indictment 75–CR–1059 were dismissed.

2. The Government's evidence consisted of hundreds of documents and 40 witnesses, including 5 of the 8 named defendants. Defendant Corr introduced several business records, testified on his own behalf and called 4 witnesses. Defendant Drayer called no witnesses and did not testify on his own behalf.

3. On eleven counts of indictment 75–CR–803 Corr was sentenced to a term of imprisonment of two years and on twenty counts of indictment 75–CR–803 he was sentenced to a term of imprisonment of two and one-half years. On nine counts of 75–CR–1059 he was sentenced to a term of imprisonment of two and one-half years. All sentences on both indictments were to run concurrently.

sale and purchase of the stock of Jerome Mackey's Judo, Inc. ("Judo") supported by substantive offenses covering the period from June 1, 1971 to approximately June, 1973. During this period Judo stock was both purchased and sold through various brokerage firms, primarily at Corr's direction or with his knowledge and assistance, and in various accounts at brokerage firms without the authority of those in whose names the accounts were opened. To accomplish their purposes and to screen their activities, techniques of placing "wooden tickets"[4] and "parking"[5] securities were employed by some of the defendants. In the course of the operation Corr filed a false application for a loan from the Underwriters Bank & Trust Co., New York, and testified falsely before the Securities and Exchange Commission ("SEC"). At all relevant times Mackey appeared to be the chief operating officer of Judo and owned a majority of Judo's outstanding shares of stock. The following is an approximate chronology of the subsequent events.

*Public Offering and Marketing*

The Judo corporation was founded by Jerome Mackey in 1958 for the purpose of giving instructions in the martial arts. Corr first met Mackey in August, 1970. Later, on January 9, 1971, Corr entered into an employment contract with Judo. Pursuant to this contract Corr was employed by Judo at a salary of $500 per week and agreed to assist Judo in its franchise program, to secure and organize Judo's schools in Florida and to work on acquisitions for the company. On August 16, 1971, a registration statement of Judo became effective authorizing a public offering of up to 165,000 shares of Judo stock which was traded over-the-counter. By November 21, 1971, the approximate expiration date of the registration statement, Judo had sold 104,700 shares to the public. On November 23, 1971, Corr and Judo entered into a second contract wherein Corr agreed to assist Judo in mergers, acquisitions, public relations and financing. In order to insure the success of this public offering Corr persuaded Dorsey Buttram and James Diamond, two Oklahoma businessmen, to purchase a substantial amount of Judo stock, guaranteeing them against any loss from the purchases.

In January, 1972, Corr contacted R. Bruce Buschbaum, who was employed as a trader with the brokerage firm of Sterling, Grace & Co. ("Sterling Grace"), for the purpose of retailing Judo's securities to the customers of Sterling Grace and of making a market in Judo. Buschbaum undertook the task and continually kept Corr informed of who was buying and selling Judo stock. In February, 1972, Corr met Richard Sobel and Daniel Salant, registered representatives for the firm of CBWL–Hayden, Stone, Inc. ("Hayden Stone"), and successfully induced them to solicit their customers to purchase Judo stock.

In April or May, 1972, Corr met Barry Chajet, a trader at Morgan, Kennedy & Co., Inc. ("Morgan Kennedy"), who at the time was "shorting" Judo. He convinced Chajet to stop "shorting" Judo by explaining to him that he, Corr, was involved with Judo, that the company was doing well and that Corr had the "box in the stock"[6] and further that 60% or 70% of the outstanding shares were in the hands of either himself, friends, relatives or people he felt he controlled. This was demonstrated by Corr's showing Chajet a list of all Judo stockhold-

---

**4.** A "wooden ticket," in general, is an order to purchase securities for which the purchaser does not pay whether or not the intention not to pay existed at the time of the order.

**5.** "Parking" is an artificial device to avoid depressing the market price and it occurs when a broker, unable to keep securities in his trading account, ostensibly sells the same to another broker, with the understanding that the same securities will be purchased back by the osten-

sible seller before the settlement date. In this manner the shares are not sold into the market.

**6.** "Box in the stock" was defined by one of the defendants to mean a situation where an individual has physical possession of a sufficient number of a company's shares so as to make it impossible for marketmakers to deliver the securities. This produces a "thin" market in the securities and reduces liquidity.

ers. Shortly thereafter Chajet covered his "short" position and went "long" in the stock. In June, 1972, Corr purchased from Mackey 125,000 restricted shares of Judo stock at $1.25 per share, which agreement was backdated to February, 1972. It was also in June, 1972, that Corr was introduced to William Murphy, a trader at Piper, Jaffrey & Hopwood, Inc. ("Piper Jaffrey"), by Buschbaum. Thereafter Corr successfully persuaded Murphy to solicit buyers for Judo stock.

*Price Manipulation*

Throughout 1972 Corr kept in constant contact with each of the above brokers who were encouraged to solicit purchases of Judo stock and was informed by each of them as to their positions in the stock and the names of all buyers and sellers. During this time Corr frequently "directed orders" [7] to and from each of these brokers and advised them when and where to buy and sell Judo stock among the marketmakers and the retail houses. In addition, at various times Corr directed both Buschbaum and Chajet, who were the two principal marketmakers in Judo stock, to maintain the high bid on Judo stock. In order to keep shares from being sold on the market, Corr directed and arranged for the "parking" of Judo securities with various brokers, one of whom was Buschbaum. For example, when Buschbaum exceeded the dollar limit of Judo stock placed upon him by his superiors at Sterling Grace he arranged to "park" thousands of shares of Judo stock with Murphy at Piper Jaffrey and thereby kept those shares out of the market supply. Judo securities were thus "parked" by Murphy on four separate occasions.

At the same time that Corr was directing these transactions he was buying and selling Judo stock, unbeknown to the marketmakers, for his own benefit through his own accounts and accounts opened in the names of others. Such transactions were effectuated when Corr opened accounts in the names of Kathleen Newberry, his former wife; Joseph Sonberg, his half-brother; and Raymond Corr, his natural brother, after he had induced them to sign brokerage account cards for that purpose. Throughout the year Corr traded Judo securities through these accounts without the knowledge or consent of any of the above persons in whose names the accounts were opened.

In approximately May, 1972, when Corr learned that Sobel and Salant had begun selling Judo stock for their customers he persuaded them to cease such selling and instead induced them to solicit their customers to purchase Judo stock by offering each of them an option to purchase 500 shares of Judo at $5.00 per share. The offer was apparently accepted and Sobel and Salant began purchasing Judo for their customers.

*The Stock "Swap"*

In September, 1972, Corr received a letter from the National Association of Securities Dealers threatening to delist Judo stock in the quotations on the National Association of Securities Dealers Automated Quotations ("NASDAQ") because the stock was distributed among too few shareholders. In order to place shares of Judo stock in the hands of at least 300 shareholders, the minimum needed for NASDAQ listing, Corr and Allen Kern, operations manager at Morgan Kennedy, agreed to "swap" Judo stock, held by Corr and his associates for securities of Health Delivery Systems, Inc. ("Health"), then held by customers of Morgan Kennedy, on an equal dollar basis.

During this time, in order to maintain the market price of Judo, Corr instructed Buschbaum to keep the "high bid" in Judo and at the same time instructed Drayer to create demand for Judo stock by placing "wooden tickets" at brokerage firms for approximately $250,000 worth of Judo stock. Pursuant to these instructions Drayer on October 13, 1972, and October 16, 1972, placed a "wooden ticket" at H. Hentz

---

7. A "directed order" has been defined as a pre-arranged order where a third party arranges for the buyer of securities to contact the seller, or where a third party pre-arranges a transaction between brokerage firms. In either case, Corr was the third person.

& Co., Inc. ("Hentz") through an account opened by Alan Dante, a friend of Drayer, for approximately $70,000 worth of Judo stock. On October 17, 1972, Drayer opened an account at Merrill Lynch, Pierce, Fenner & Smith, Inc. and immediately placed a "wooden ticket" with that firm for $28,000 worth of Judo stock. On October 19, 1972, Drayer opened an account at Dominick & Dominick, Inc. and immediately placed another "wooden ticket" with that firm also for approximately $150,000 worth of Judo stock.

While Drayer was placing the above "wooden tickets" Corr was also placing "wooden tickets" for Judo stock with other brokers. On October 17, 1972, he placed one with Sterling Grace for approximately $107,800 worth of Judo stock and in late October, 1972, he placed another with Margolis & Co. for approximately $42,000 worth of securities.

During the same period from October 11, 1972, to approximately October 17, 1972, while the market manipulations were being effected, the "swap" for Health stock was also being consummated. During all of this time Corr received into his bank accounts over $1,000,000 from the sale of Judo stock through both his own brokerage accounts and those set up in the names of others. When Corr was subsequently unable to pay for 20,000 shares of the Health stock involved in the "swap" he attempted to sell that stock without success to Raphael Ventura whose relationship to Corr is more fully described hereafter. As a result of the "swap" Morgan Kennedy and its customers lost approximately $1 million when the price of Judo stock immediately fell thereafter.

*Ventura and the South American Connection*

Dr. Isaac Cohen, a Chilean born medical doctor practicing medicine in Long Island, maintained a brokerage account at Hentz serviced by Barry Drayer. Through Cohen, Barry Drayer learned that Raphael Ventura, a Chilean and Cohen's cousin, was interested in making investments in the United States. In October, 1972, Barry Drayer informed Corr of Ventura's interests and soon thereafter Ventura and Corr met. At this meeting Corr offered Ventura the above-mentioned deal with regard to Health stock involved in the "swap" but Ventura rejected the same. Instead Ventura agreed to give Corr $80,000 to invest, which investment Corr guaranteed to protect by putting up $100,000 worth of other securities. In addition, Dr. Cohen was persuaded to put up approximately $20,000 and Dr. Lester Van Ess, a friend of both Cohen and Barry Drayer, was persuaded to put up approximately $90,000 for investment by Corr. In late 1972 and pursuant to these arrangements Barry Drayer opened up accounts at Raymond, James and Associates, Inc., St. Petersburg, Florida, for which firm in October, 1972, R. Corr had become a registered representative. He opened these accounts in the names of Ventura, Van Ess and Jose Cohen, Dr. Cohen's brother in Chile. Through these accounts Corr, from late 1972 to May, 1973, purchased hundreds of thousands of dollars worth of Judo securities in addition to the $190,000 given to him by Ventura, Cohen and Van Ess, the total amount of which was lost.

In April, 1973, Barry Drayer convinced Sobel and Salant to open an account at Hayden Stone in the name of Van Ess. On April 26, 1973, Barry Drayer placed an order for 2,000 shares of Judo stock through the Van Ess account, and on May 7, 1973, Corr placed a "wooden ticket" for another 2,000 shares in the Van Ess account.

*False Bank Loan Application*

In the fall of 1972 Corr, who then needed funds to pay for the purchase of Judo stock which he made for his own account, filed a false bank loan application at the Underwriters Bank & Trust Co., New York, forging the name of Kathleen Keogh, the maiden name of his former wife. The proceeds of this loan went into Corr's account.

*The SEC Investigation*

On May 10, 1973, the SEC suspended trading in Judo stock and undertook an

investigation which included the testimony of Corr. On August 24, 1973, the SEC issued a release which announced the termination of the suspension of trading in Judo stock.

## CORR'S APPEAL

On appeal Corr has mounted a series of attacks upon the trial court's rulings and charges which relate to: (1) numerous exclusions of evidence by Judge Weinfeld which unconstitutionally impaired his right to a fair trial; (2) insufficiency of the evidence as to counts two through nine [sale of unregistered securities]; (3) failure to dismiss the false statement claims; (4) failure to exclude evidence of similar acts; and (5) errors in the charge by giving a *Pinkerton* charge and by an unfair marshalling of the evidence. We have considered this omnibus attack and find that only a few of the claims merit consideration which we discuss below. We reject the other claims.

*False Statement Claim*

▮ Corr was charged with making false statements before the SEC in violation of 18 U.S.C. § 1001 which protects the authorized functions of the various governmental departments from any type of deceptive practice. *United States v. Gilliland*, 312 U.S. 86, 61 S.Ct. 518, 85 L.Ed. 598 (1941); *United States v. McCue*, 301 F.2d 452 (2d Cir.), *cert. denied*, 370 U.S. 939, 82 S.Ct. 1586, 8 L.Ed.2d 808 (1962). He now claims that four of those counts should have been dismissed because the allegedly false answer upon which Count 4 of the Indictment is based was unresponsive and the allegedly false answers upon which Counts 6, 7 and 10 are based are consistent with the Government's version of the facts or are responsive as to questions so imprecise as to preclude prosecution pursuant to § 1001.

With regard to Count 4 Corr was asked whether he had made any "other sales for Mr. Bradley of the stock" to which he answered in the negative but then proceeded to state that he had an interest in a South American group, the Ventura family, who wanted to gain control of Judo and that

"we did want to in effect buy control." There was substantial evidence that the Ventura group did not want to buy control of Judo and that Corr was interested in buying the Judo stock because he had exhausted the discretionary amounts in the accounts of Ventura, Cohen and Van Ess and began trading with his own money and "wooden tickets" through those same accounts.

So also with the false statement charges in Counts 6 and 7 in which Corr testified that Sonberg and Keogh "maintained" brokerage accounts and that Sonberg purchased Judo stock in 1972 and the accounts of both Sonberg and Keogh were maintained at low cash balances because of continual substitutions and accumulations of Judo stock. Both Sonberg and Keogh testified to the contrary and stated that they were unaware of the transactions effectuated through the accounts opened in their names. Indeed, their testimony expressly challenged Corr's statements concerning accumulations and cash balances in these accounts. With respect to the false statement charge in Count 10, Corr stated that he did not "believe" that he made any "price projections" to Buschbaum or anyone else concerning Judo stock, whereas evidence adduced by the Government clearly showed that such projections were made to Chajet. Corr claims that he did make *earnings* projections and that it was the obligation of the prosecutor to pose one additional question in order to make his ambiguous question more precise.

In arguing that Counts 4, 6, 7 and 10 of indictment 75–CR–1059 should have been dismissed, Corr relies on *Bronston v. United States*, 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973), which held that prosecutions for perjury under 18 U.S.C. § 1623 would not lie for unresponsive but "literally truthful" answers which were only arguably false by negative implication. In such situations, the Court believed that the vice sought to be prevented by the perjury statute could be cured readily enough by asking the witness additional questions which would force the witness to confirm or deny

explicitly any and all allegedly false implications.

While conceding that the answer which forms the basis of Count 4 is unresponsive, the Government would distinguish *Bronston* on the ground that the answer given by Corr was concededly false. Corr's contention is troublesome, and its resolution depends upon one's interpretation of *Bronston*. *Bronston* can be construed broadly as enunciating a policy that investigations should be used to uncover the truth and not simply as a breeding ground for perjury prosecutions. If this is what *Bronston* is all about, then it could be argued that no unresponsive answer is prosecutable regardless of its truth or falsity. But we believe that this interpretation extends *Bronston's* holding beyond its rationale. In *Bronston* the unresponsive answer was literally truthful and the defendant was prosecuted not for something that he had said, but for something *unstated*. The implication was that which the prosecution reasoned was false. Thus, *Bronston* can be interpreted as merely holding that the mere fact of unresponsiveness is insufficient to support the inference of the implication's falsity. If there is a doubt about the truth of what is implied, questioning will force the witness to expose the unstated implications and either explicitly confirm or deny them.

But where as in this appeal the answer is false, the fact that it is unresponsive is immaterial. The crime is based on the explicit statement rather than on an unstated implication. Thus, the falsity is not conjectural and the proof of falsity is not premised on inferences attempted to be extracted from the fact of unresponsiveness. Furthermore, calling the witness' attention to the unanswered question to cure the unresponsiveness will in no way cure the prior falsehoods which the witness has put on the record in his unresponsive answer. Regardless of how or whether the witness responds to the question which he has yet to answer, the record remains tainted by the false testimony which he has already volunteered during his initial nonresponse.

The unresponsive but false answer is just like the volunteered but false testimony. This Court has held that such volunteered information is prosecutable under 18 U.S.C. § 1001, *United States v. Adler*, 380 F.2d 917 (2d Cir.), *cert. denied*, 389 U.S. 1006, 88 S.Ct. 561, 19 L.Ed.2d 602 (1968), and there is nothing in the statutory language which draws a distinction between testimony which is volunteered and testimony which is elicited by questions. Appellant also relies on *United States v. Cobert*, 227 F.Supp. 915 (S.D.Cal.1964), where the court indicated that the minds of the questioner and answerer must meet before an answer can be perjurious. But this case is distinguishable since there is no evidence that Corr did not understand the questions and since the false answer was volunteered out of the blue unrelated to any question.

The claim that Corr misunderstood the questions set forth in Counts 6, 7 and 10 because they were imprecise presents the issue of interpretation placed upon the question by the defendant at the time of the alleged prevarication. This is an issue for the jury which rejected Corr's contentions. *United States v. Bonacorsa*, 528 F.2d 1218, 1221 (2d Cir.), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2647, 49 L.Ed.2d 386 (1976); *United States v. Chapin*, 169 U.S.App.D.C. 303, 515 F.2d 1274, *cert. denied*, 423 U.S. 1015, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975). In Count 10 the answers were demonstrably false to anyone disposed to answer truthfully.

*The Pinkerton Charge*

Concerning the substantive Counts 12 through 33, the trial judge charged the jury under the concept of *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). This decision is based upon the theory of vicarious liability which holds conspirators criminally liable for the substantive offenses of their co-conspirators committed during and in furtherance of the conspiracy. Appellant Corr asserts that the *Pinkerton* charge should not have been given in this case in view of the recent decisions of this Court in *United States v. Ber-*

*mudez,* 526 F.2d 89, 98–99 (2d Cir. 1975); *United States v. Miley,* 513 F.2d 1191, 1208–09 (2d Cir. 1975), *cert. denied,* 423 U.S. 842, 96 S.Ct. 74, 46 L.Ed.2d 62 (1976), and *United States v. Sperling,* 506 F.2d 1323, 1341–42 (2d Cir. 1974), *cert. denied,* 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975). Appellant attempts to place the facts in this case within the framework of *Sperling* where Judge Friendly in *dicta* pointed out that the *Pinkerton* charge should not be given as a matter of course and in particular where the evidence is such that the jury is required to resort to the inverse of *Pinkerton* and infer the existence of a conspiracy from the series of disparate criminal offenses. Appellant's attempt to evade *Pinkerton* through *Sperling* is unjustified since the evidence here was overwhelming that he was not only a member of the conspiracy but was the architect of the conspiracy and personally committed most of the substantive acts himself during and in furtherance of the conspiracy. Moreover, the cases cited by Corr in no way militate against the *Pinkerton* charge which indeed has retained its vitality in this circuit as reaffirmed by recent decisions. *See United States v. Finkelstein,* 526 F.2d 517, 522 (2d Cir. 1975); *United States v. Aloi,* 511 F.2d 585, 600 (2d Cir.), *cert. denied,* 423 U.S. 1015, 96 S.Ct. 447, 46 L.Ed.2d 386 (1975). We find no merit to appellant's claim.

*"Control Person" Evidence*

In Counts 2 through 9 Corr was charged with the sale of unregistered securities of Judo in violation of 15 U.S.C. § 77e. The charge was based on the contention that Corr was a "control person" (as the term is defined in Rule 405 promulgated under the Securities Act of 1933) when he sold to the public over 94,000 shares of Judo between March 6 and November 2, 1972. The Government asserts that the Judo stock referred to in those counts was sold by a "control person" and accordingly such stock was required to have been re-registered before sale. *See United States v. Wolfson,* 405 F.2d 779, 782 (2d Cir. 1968), *cert. denied,* 394 U.S. 946, 89 S.Ct. 1275, 22 L.Ed.2d 479 (1969). Appellant Corr attacks the conviction upon the ground that the evidence was insufficient to establish that he was such a "control person." He claims that the evidence indicates that Mackey at all times relevant was the chief executive officer and owned more than 50% of the outstanding stock of Judo and therefore Corr was not in control.

While there is no statutory definition of "control," its concept is not a narrow one. Its determination is a question of fact which depends upon the totality of the circumstances including an appraisal of the influence upon management and policies of a corporation by the person involved. Control may be exerted in other ways than by vote, *SEC v. American Beryllium & Oil Corp.,* 303 F.Supp. 912, 915 (S.D.N.Y.1969), stock ownership being only one aspect of control. A person may be in control even though he does not own a majority of the voting stock, *SEC v. R. A. Holman & Co.,* 377 F.2d 665, 667 (2d Cir.), *cert. denied,* 389 U.S. 991, 88 S.Ct. 473, 19 L.Ed.2d 482 (1967); *accord, SEC v. International Chemical Dev. Corp.,* 469 F.2d 20, 28 (10th Cir. 1972), and such control may rest with more than one person at the same time or from time to time, *North American Co. v. SEC,* 327 U.S. 686, 693, 66 S.Ct. 785, 90 L.Ed. 945 (1946); 2 Loss, Securities Regulation 775 (2d ed. 1961). In the present case the evidence was overwhelming that Corr was responsible for numerous and essential programs of Judo including financing of Judo. He controlled Judo's financial relationship with the public and was able to exercise authority independent of Mackey and at the same time influence the authority exercised by Mackey.

*Exclusion of SEC Release*

Upon this issue it is Corr's contention that the trial judge was in error in excluding from the evidence a SEC release dated August 24, 1973, dealing with the results of that agency's investigation into trading in Judo, reading in part as follows:

"It appears that the public float in the stock, the number of shares available for

public trading, is approximately 250,000 shares of which approximately 150,000 shares or 60% of such float may be controlled directly or indirectly by one person. It is possible therefore that Mackey's stock may be subject to erratic price movements."

Corr claims that the person referred to in the quotation was himself and that he was entitled to use this release to show a prior determination by the Government that 150,000 of his shares were "available for public trading" and part of the "float" as evidence against the Government's charge that he was a "control person." The obvious purpose of the announcement was to notify the public that the trading suspension of Judo securities was lifted and further, that the price "may be subject to erratic price movements" because of the control by one individual of 60% of the "float." We need not decide whether the statement purported to be a finding by the SEC that the 150,000 shares were properly in the "float" as registered stock or whether such a finding would under the present circumstances have had any effect upon the jury. It is sufficient to note that the document was hearsay outside of the hearsay exception of Rule 803(8)(c) of the Federal Rules of Evidence since the release was not a determination of facts obtained after administrative proceedings. We not only find its relevance minimal but, more important, inadmissible as hearsay.

*Exclusion of Other Evidence*

 Appellant Corr relies heavily upon the charge that the trial court erred in excluding certain evidence on seven different occasions, which exclusions he claims prevented him from presenting a full defense and unconstitutionally impaired his right to a fair trial. It has been long recognized that a defendant's right to present a full defense is a fundamental element of due process derived from both the Sixth and Fourteenth Amendments. *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1972); *Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972); *Washington v. Texas,*

388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); *In re Oliver,* 333 U.S. 257, 273, 68 S.Ct. 499, 92 L.Ed. 682 (1948). But rejection of testimony by the trial court does not necessarily mean that the defendant has been deprived of due process. The accused as well as the Government must comply with the established rules of procedure and evidence in order to assure both a fair trial under the circumstances. In examining Corr's objections we must also keep in mind that questions relating to the admissibility of evidence, relevancy of proffered evidence and the scope of cross-examination are all questions to be determined subject to the rules of evidence and in doubtful cases subject to the discretion of the trial court, the exercise of which may be overturned on appeal solely upon a showing of clear abuse of that discretion. *Hamling v. United States,* 418 U.S. 87, 124–25, 127, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974), (admissibility of evidence); *United States v. Catalano,* 491 F.2d 268, 273 (2d Cir.), *cert. denied,* 419 U.S. 825, 95 S.Ct. 42, 42 L.Ed.2d 48 (1974), (relevancy of proffered evidence); *Alford v. United States,* 282 U.S. 687, 694, 51 S.Ct. 218, 75 L.Ed. 624 (1931), (scope of cross-examination); and *Hamling v. United States, supra,* 418 U.S. at 127, 94 S.Ct. 2887, (collateral issues causing confusion). In applying the above principles we have concluded that only the three charges of exclusion relating to the testimony of Lewis Braff deserve attention and that the remaining claims are frivolous.

 As part of his defense appellant Corr denied that he made net profits from the Judo transactions but claimed instead that he had suffered losses of over $1.1 million by his investment in Judo securities and franchises during and for some months after the alleged conspiracy. As support for these claims Corr offered the testimony of Lewis Braff, a Certified Public Accountant, who had been Corr's accountant for over ten years, and also certain financial summaries. Corr contended that this evidence was probative of his good faith and was inconsistent with the fraudulent purpose charged by the Government. The trial judge permitted Braff's testimony and

charts to show any losses sustained by Corr in his trading of Judo stock during the conspiracy. He refused, however, to permit Corr through Braff to show losses sustained by Corr as a result of (1) events which occurred subsequent to June, 1973;[8] (2) investments in Judo franchises, and (3) failure of Ventura, Cohen and Van Ess (South Americans) to repay loans claimed by Corr to have been made to them and invested by Corr in Judo for their accounts. By these exclusions Corr claims that he was able to prove losses of only $144,000 instead of $1 million he actually sustained.[9]

We have no difficulty in sustaining the trial court's ruling upon the first two restrictions although we are troubled about its ruling excluding evidence by Braff as to the losses allegedly sustained by Corr as a result of his loans to the South Americans since the testimony was relevant to Corr's good faith and tended to corroborate part of Corr's own testimony. But the Government through its witnesses claimed that the amounts involved in these alleged loans were not in fact loans but represented Corr's own funds employed by him to purchase Judo stock for himself through the accounts of the South Americans without their authority as part of his manipulative devices. However, Corr had already testified as to the $400,000 loss sustained as a result of these loans and his counsel upon summation argued that it was evidence of Corr's good faith. Consequently, the jury had ample opportunity to consider and weigh the defense, which it obviously rejected. In view of the overwhelming evidence of Corr's manipulations and the discretionary nature of the exclusion, we cannot say that the restriction was an abuse of the trial court's discretion.

## DRAYER'S APPEAL

▮ Drayer's appeal raises no serious questions. He claims that the case against him should have been severed and that in all events all counts should have been dismissed for insufficient evidence and fur-

ther, that he was denied a fair trial by reason of the court's failure to exclude evidence of a similar act involving the placing of a "wooden ticket" for Ducatel Corporation stock. The most important of Drayer's charges relates to the claim for severance. Rule 14 of the Federal Rules of Criminal Procedure empowers the court to grant severance to a defendant who will be prejudiced by the joinder of offenses or of defendants. When, however, the crime charged in the indictment is provable against all the defendants by the same evidence and the offenses arise out of the same or similar series of acts it is preferable in the interest of judicial economy to try the defendants together absent substantial prejudice to the accused. *United States v. Kahaner*, 203 F.Supp. 78, 80–81 (S.D.N.Y. 1962) (Weinfeld, J.), *aff'd*, 317 F.2d 459 (2d Cir.), *cert. denied*, 375 U.S. 836, 84 S.Ct. 73, 11 L.Ed.2d 65 (1963). To succeed upon appeal a defendant must demonstrate that he suffered such prejudice as a result of the joinder, not that he might have had a better chance for acquittal at a separate trial. *United States v. Borelli*, 435 F.2d 500, 502 (2d Cir. 1970), *cert. denied*, 401 U.S. 946, 91 S.Ct. 963, 28 L.Ed.2d 229 (1971); *United States v. DeSapio*, 435 F.2d 272, 280 (2d Cir. 1970), *cert. denied*, 402 U.S. 999, 91 S.Ct. 2170, 29 L.Ed.2d 166 (1971).

▮ Drayer claims that he was tarred with the same brush as Corr and his co-conspirators although Corr was in the center of the conspiracy while Drayer just stood on the periphery. We disagree. Drayer was by no means a silent partner in this conspiracy and appears on a number of occasions in the scheme to manipulate the market price of Judo. Although he was not a member of the conspiracy during the earlier stages, he was by no means a peripheral defendant and there was substantial evidence against him demonstrating his unlawful participation in the conspiracy and the wrongful acts committed to effectuate its objectives. Courts have raised the question

---

**8.** The conspiracy terminated in June, 1973.

**9.** Upon imposition of the third limitation the defense decided not to call Braff as a witness.

in a similar context whether a jury can compartmentalize the evidence and distinguish it among various defendants in a multi-defendant suit. *United States v. Papadakis,* 510 F.2d 287, 300 (2d Cir.), *cert. denied,* 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975). Evidence that the jury in this case was able to do just that appears from the jury's inability to reach a verdict with respect to Barry Drayer, brother of Roger Drayer. Judge Weinfeld was very careful in instructing the jury to alleviate any prejudice that might have resulted from a misjoinder of the defendants, emphasizing the fact that proof against Drayer was different from the proof against Corr and that each should be given separate and distinct consideration. We believe that the jury was able to distinguish between the two and we cannot ascribe any spill-over of evidence against Corr which affected Drayer. *See United States v. Papadakis, supra,* 510 F.2d at 300–01; *United States v. Baum,* 482 F.2d 1325, 1332 (2d Cir. 1973); *United States v. Jordan,* 399 F.2d 610, 615 (2d Cir.), *cert. denied,* 393 U.S. 1005, 89 S.Ct. 496, 21 L.Ed.2d 469 (1968). Consequently, the court did not err in denying the motion to sever.

The evidence against Drayer upon the counts on which he was indicted was more than sufficient to justify conviction and in addition the court acted properly in admitting as a similar act against Drayer a "wooden ticket" for the sale of Ducatel stock placed with M.S. Wien in September, 1972, to show motive and intent. *See* Rule 404(b) of the Federal Rules of Evidence.

Affirmed.