**UNITED STATES of America, Appellee,**

v.

**Daniel BIFIELD, Appellant.**

**No. 544, Docket 82–1281.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 7, 1982.

Decided March 3, 1983.

Certiorari Denied May 16, 1983.
See 103 S.Ct. 2095.

---

344

John R. Williams, New Haven, Conn., for appellant.

David K. Rose, Intern, Bridgeport, Conn. (Alan H. Nevas, U.S. Atty., D. Conn., New Haven, Conn., Harold James Pickerstein, Chief Asst. U.S. Atty., Bridgeport, Conn., Jeremiah Donovan, Asst. U.S. Atty., D. Conn., New Haven, Conn., for appellee.

Before FEINBERG, Chief Judge, and KAUFMAN and CARDAMONE, Circuit Judges.

CARDAMONE, Circuit Judge:

On September 23, 1981 appellant, Daniel Bifield, an inmate awaiting sentencing at the Bridgeport Community Correctional Center in Connecticut, gained access to the cell adjoining his and escaped through an open window. After spending several weeks in the United States, he fled to the Bahamas. While in hiding there and for the over four months that he was at large, Bifield became the object of an international manhunt. Successfully managing to elude his pursuers, he finally returned to the United States in late January 1982 and went to Denver, Colorado. There his luck ran out. On February 5 he was captured by United States Marshals and Special Agents of the Federal Bureau of Investigation (FBI).

Bifield was returned to Connecticut, and tried on a single count of escape from the custody of the Attorney General of the United States, in violation of 18 U.S.C. § 751(a) (Supp. V 1981), before Judge Ellen B. Burns and a jury in the District of Connecticut. Found guilty on June 10, 1982, appellant was sentenced to a five-year term of imprisonment to be served consecutively to the sentences being served at the time of his escape.

Several issues are raised on this appeal. The first is whether Judge Burns erred when she rejected as a matter of law appellant's defense of duress[1] to the charge of escape. The second, related to the first, is whether the effect of the trial court's ruling denied appellant his constitutional and statutory right to testify on his own behalf before the jury which tried him. The third is whether the trial court's charge to the jury unconstitutionally diluted the presumption of innocence. Before discussing these issues we briefly detail the factual

---

1. We note that both parties and the court below referred to the defense as one of duress and necessity. "Common law historically distinguished between the related defenses of duress and necessity." *United States v. Bailey*, 444 U.S. 394, 409, 100 S.Ct. 624, 634, 62 L.Ed.2d 575 (1980). The defense of duress applied where the coercion of the defendant resulted from the actions of other persons. *Id.* at 409–10, 100 S.Ct. at 634. Necessity traditionally covered situations in which other physical forces beyond the actor's control rendered the illegal conduct the lesser of two evils. *Id.* at 410, 100 S.Ct. at 634. While modern case law has tended to blur the distinction between the terms, *id.*, we think Bifield's defense in this case is properly labelled one of duress.

background, particularly as it bears on appellant's claim of duress.

At a hearing outside the presence of the jury the duress defense was fully presented. Prior to his escape Bifield was suffering from kidney stones. A doctor who had examined appellant on August 5, 1981 confirmed the kidney stone diagnosis and testified that pain associated with that condition is often so severe as to require immediate medical attention and hospitalization. A fellow inmate stated that Bifield complained of pain and having blood in his urine. Requests to the Bridgeport jail medics to render some sort of treatment were ignored. Another doctor testified that he saw Bifield at St. Vincent's Hospital Emergency Room in Bridgeport sometime in August 1981 and found him to be suffering from "acute renal colic with a documentation of blood in his urine." The doctor stated that the patient was in need of acute care hospitalization. However, United States Marshals did not permit him to remain at St. Vincent's, but instead transported him to a hospital within the Connecticut State Prison. Appellant presented evidence that while in the State Prison he received no medical care. Further testimony was presented that during this period Bifield was in a good deal of pain—"holding his side ... vomiting." Appellant testified that after just a few days at the State Prison he was sent back to Bridgeport where officials refused him admission to the jail infirmary. He stated that one evening while he was in great pain ("I would have been glad if I died"), and shortly after his request to see a medic was ignored, he saw a wide open window in the adjoining cell. He gained access to the cell and escaped. Bifield claimed that he left the Bridgeport facility because officials there refused to treat his condition.

He stated that four weeks after his escape he obtained medical treatment at the Princess Margaret Hospital in Nassau. Aware of pursuit by the FBI, he moved on to Andros Island, also in the Bahamas, where he received further medical care. Eventually he was forced to flee the Bahamas to avoid capture. He claimed that it was his intention to surrender himself when cured, but that the threat which caused him to flee prison had not yet evaporated and that its coercive force still existed at the time of his arrest in Denver:

> Q—[C]an you tell the Court whether or not it was your intention that once you got cured you would turn yourself in?
>
> A—I would. I was going—when I was ready, when I was all ready I was going to get in contact with you and say, "John, I'm ready to give myself up."

The reason he gave for not contacting his lawyer was that he was still suffering from attacks of kidney stones. On cross examination he conceded that while in the Bahamas he swam in the hotel pool, used the beach, went horseback riding and rented a boat to take a ride.

Finally, it appears that appellant was familiar with prison procedures for making a complaint regarding treatment in jail. He claims that he spoke to Bridgeport jail counselors many times and that they merely referred him to the medical department which ignored him. He also said that he spoke to his father and to his wife. According to him, none of these efforts produced results.

After the presentation of this proof, the trial court ruled that the defense of duress or necessity failed as a matter of law and could not be presented to the jury. As a result, appellant claims he was prohibited from taking the stand in his own defense and rested his case without presenting any evidence.

I

We turn to appellant's contention that the district court erred in rejecting as a matter of law his defense of duress. Bifield claims that he presented sufficient evidence to raise at least a factual dispute as to each element of the defense, and that such disputes require jury resolution.

In order to establish the duress defense, a prisoner charged with attempted escape must show the existence of all of the following conditions:

(1) the prisoner must be faced with a specific threat of death or substantial bodily injury in the immediate future; (2) there must be no time for a complaint to the authorities or there must exist a history of futile complaints which make any benefit from such complaints illusory; (3) there must be no evidence of force or violence used towards prison personnel or other "innocent" persons in the escape attempt; and (4) the prisoner must intend to report immediately to the proper authorities when he attains a position of safety from the immediate threat.

*United States v. Boomer,* 571 F.2d 543, 545 (10th Cir.), *cert. denied,* 436 U.S. 911, 98 S.Ct. 2250, 56 L.Ed.2d 411 (1978); *United States v. Wyler,* 526 F.Supp. 76, 77–78 (S.D.N.Y.1981), *aff'd,* 697 F.2d 301 (2d Cir.1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 145, 74 L.Ed.2d 122 (U.S. 1982). Where, as here, a defendant actually succeeds in escaping from federal authorities and is subsequently charged with escape, he must prove that he made a bona fide effort to surrender as soon as the claimed duress lost its immediate coercive force. *See United States v. Bailey,* 444 U.S. 394, 412–13, 100 S.Ct. 624, 635–36, 62 L.Ed.2d 575 (1980); *United States v. Trapnell,* 638 F.2d 1016, 1030 (7th Cir.1980); *United States v. Michelson,* 559 F.2d 567, 570 (9th Cir.1977) (escapee must submit to proper authorities after obtaining a position of safety). Where the evidence, even if believed, fails to establish all of the elements of the duress defense, the trial court may rule upon the defense as a matter of law and need not submit it to the jury. *See Bailey,* 444 U.S. at 415, 100 S.Ct. at 637; *Trapnell,* 638 F.2d at 1030–31.

■ We examine the proof at trial giving full credence to appellant's version of this episode. Appellant testified that he was forced to escape because officials at the Bridgeport Community Correctional Center repeatedly refused to treat him for kidney stones which were causing him great pain.

Concededly, no force was used in the escape. We accept, as did Judge Burns, appellant's claims that the Bridgeport prison officials refused to treat him, that this refusal threatened him with "substantial bodily injury," and that further requests to those officials for medication would have been futile. Nonetheless, no evidence was offered that Bifield ever attempted to turn himself in after he had escaped from the *immediate* danger to his health present at Bridgeport, i.e., his inability to obtain adequate medical treatment at the Bridgeport facility. After his escape appellant admits he spent three weeks in the United States without making any effort to contact anyone who could have provided him with the medical attention he claims he so urgently needed. In fact, at no point during the entire four and one half months after his escape from Bridgeport and the danger allegedly present there does it appear that appellant made any effort to report to federal officials, who could have given him medical aid.

■ Appellant did testify that he intended to turn himself in as soon as he was cured. But this self-serving statement as to past intentions, standing alone, unaccompanied by any act, simply does not support a finding of this element of the defense. *See Bailey,* 444 U.S. at 415, 100 S.Ct. at 637. Even if Bifield's testimony had the flat finality of Douglas MacArthur's famous—"I shall return"—phrase, it would be of no consequence here. For courts must look to an escapee's bona fide attempt to turn himself in and not to his intention to do so, no matter how convincingly expressed. Thus, appellant's duress defense fails as a matter of law.

## II

■ Given that the defense failed as a matter of law,[2] we must next determine whether the district court properly passed upon it before the jury had an opportunity to hear appellant. Appellant argues that

---

**2.** Since Bifield failed to raise a factual issue regarding at least one of the elements of his

claimed defense, *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), and

the procedure followed by the district court was improper because those courts which have previously rejected as a matter of law an offered defense of duress or necessity at least permitted the jury to hear testimony regarding the defense before the courts ruled. This contention, however, is directly refuted by *Bailey*. *See* 444 U.S. at 400, 415, 100 S.Ct. at 629, 637; *see also Wyler*, 526 F.Supp. at 77–78 (trial court rejected offer of proof of duress before submission to jury on grounds that defense failed as a matter of law and offered testimony was therefore irrelevant). In *Bailey* four defendants were charged with escape. The district court admitted testimony bearing on duress and necessity at the trial of the first three, but ruled at the close of the evidence that it was insufficient as a matter of law to support the defense. 444 U.S. at 399–400, 100 S.Ct. at 629. At the separate trial of the fourth defendant the trial court excluded testimony offered to establish a duress defense before the jury heard it, ruling that the evidence was insufficient as a matter of law to establish the defense. *Id.* at 400, 100 S.Ct. at 629. In upholding the district court's rulings, the Supreme Court reasoned that juries should not be burdened with testimony relating to duress and necessity in cases where the asserted defense fails as a matter of law. *Id.* at 416, 100 S.Ct. at 637. Such cases, the *Bailey* Court stated, "present a good example of the potential for wasting valuable trial resources." *Id.* at 417, 100 S.Ct. at 638. Thus Judge Burns properly ruled on the offered duress defense prior to any defense testimony being taken before the jury.

### III

■ Appellant further argues that the district court's ruling on the duress defense

impermissibly denied him his constitutional and statutory right to testify at his trial. A federal defendant is clearly competent to testify in his own defense. *See* 18 U.S.C. § 3481 (1976). Whether a defendant also has a constitutional right to testify has never been resolved authoritatively by the Supreme Court. Nonetheless, we believe that such a constitutional right exists.

As Wigmore points out, until the late 1600s an accused at a jury trial had been permitted to plead his cause orally in person. His statements were unsworn and, at least in theory, did not constitute evidence. However, the accused was present at his trial, was permitted to speak and was freely questioned. What he said had an effect on the jury's view of the case. Hence, in practice, if not theory, an accused actually did furnish evidence. 2 J. Wigmore, *Evidence* § 575, at 808–09 (Chadbourn rev. 1979) (Wigmore). By the time of James II, in the late 1600s, the notion that the accused's statements were to be considered as testimony was expressly repudiated. During the 1700s the general rule of an accused's incompetency to testify became current. This rule was based upon the widely held fear that persons interested in the cause were likely to testify falsely. For fear of perjury such persons were, therefore, totally excluded as witnesses. *Id.* § 576, at 810.

While disqualification of parties of record and interested witnesses was inherited by American jurisprudence from the English rules of evidence, the reception here was not a warm one. Perhaps the reason was that the American Revolution had instilled a dislike of England and its ways, which

its progeny are readily distinguishable. In *Jackson* the Supreme Court acted to protect the due process rights of an accused by requiring that a trial court rule preliminarily on the voluntariness of a confession. Where a judge independently resolves the issue of voluntariness against the accused, the accused may still argue to the jury as the ultimate fact-finder that his confession was involuntary. In the present case the court's rejection of the proffered duress defense was made as a matter of law, not as a finding of fact. Once this deter-

mination was made, the issue of duress was properly withheld from the jury.

Similarly distinguishable are cases in which an affirmative defense (e.g., entrapment, insanity, duress) is interposed and the accused offers sufficient proof to raise at least a factual dispute as to each and every element of the defense. Under such circumstances, the court cannot pass upon the defense as a matter of law, but must submit the issues raised by the defense to the jury.

resulted in a reluctance to pay undue deference to English common law. G. Gilmore, *The Ages of American Law* 22, 23 (1977). Or perhaps Jeremy Bentham's explosive diatribe in *Rationale of Judicial Evidence,* published in 1827, cooled acceptance of the rule here because it first exposed the fallacious premises upon which the theory of the accused's disqualification to testify rested. *See* Wigmore § 575, at 811. A link can be found—although a somewhat ironic one—between Bentham[3] and the rule's discard in American jurisprudence.

At first Bentham's ideas were not accepted in America. His offers of service to President James Madison were twice turned down. C. Phillipson, *Three Criminal Law Reformers* 143 (1970). Supreme ·Court Justice Joseph Story once said privately that we would never become "votaries to the notions of Jeremy Bentham." A Schlesinger, Jr., *The Age of Jackson* 331 (1946). Despite this, so great was the power of Bentham's voluminous writings and innovative thought that it was merely a question of time before it penetrated the American legal community. Through Edward Livingston, a disciple of Bentham's and a member of President Andrew Jackson's cabinet, the great English reformer's views found acceptance during the era of Jacksonian reform. From this point, Bentham's ideas entered the mainstream of American legal thought.

Thus, the same Justice Story, writing for the Supreme Court a few years following publication in 1827 of Bentham's great treatise on evidence, while perhaps not becoming a "votary" did adopt Bentham's views. In analyzing the competency to testify of a witness whose property was allegedly stolen on the high seas, he commented that the rules in England and America were not always exactly the same. While citing the English common law rule that an interested person is not a competent witness, he went on to enumerate exceptions to that rule based on the necessity of such evidence in different kinds of cases. Justice Story then rejected both the disqualification rule and its underlying premise. He concluded that · the owner was competent to testify since, precisely as Bentham reasoned, interest does not raise a probability of falsehood, and left the question of the witness' interest to the jury because even if there is a risk of falsehood, exclusion is not the appropriate remedy. *United States v. Murphy,* 41 U.S. (16 Pet.) 128, 132–35, 10 L.Ed. 937 (1842). Having implicitly abrogated the rule of incompetency to testify based on interest the Supreme Court, a short time later, emphatically acknowledged the right of one accused of criminality to be heard:

> The order in effect denied the respondent a hearing. It is alleged that he was in the position of an alien enemy, and hence could have no *locus standi* in that forum. If assailed there, he could defend there. The liability and the right are inseparable. A different result would be a blot upon our jurisprudence and civilization. We cannot hesitate or doubt on the subject. It would be contrary to the first principles of the social compact and of the right administration of justice.

*McVeigh v. United States,* 78 U.S. (11 Wall.) 259, 267, 20 L.Ed. 80 (1871). Six years later in a related case, the Court said: "A sentence of a court pronounced against a party without hearing him, or giving him an opportunity to be heard, is not a judicial determination of his rights, and is not entitled to respect in any other tribunal." *Windsor v. McVeigh,* 93 U.S. 274, 277, 23 L.Ed. 914 (1876). And, harking back to the ancient English common law right to be heard, the Court continued: "The law is, and always has been, that whenever notice or citation is required, the party cited has

---

**3.** We cannot help briefly noting Bentham's reclusive nature. Although his long life was devoted to measures whose aim was to improve the common lot of the masses, he associated only with the few whose intellects he esteemed. From the publication of his *Fragment on Government* in 1776 he spread his canvas to the winds of legal reform, and while he exulted in the bellying sails carrying him on a collision course with the hidebound legal establishment, he never quite liked the crew. *See generally* C. Phillipson, *Three Criminal Law Reformers* 109–234 (1970).

the right to appear and be heard; and when the latter is denied, the former is ineffectual for any purpose." *Id.* at 278.

The unsoundness of an evidentiary rule of incompetency overriding an accused's right to testify, intimated in these earlier Supreme Court cases, was acknowledged by statute, and the rule was eliminated in the United States in 1878. Act of March 16, 1878, c. 37, 20 Stat. 30 (presently codified at 18 U.S.C. § 3481 and adopted in Fed.R. Evid. 601). *See generally Benson v. United States,* 146 U.S. 325, 335–37, 13 S.Ct. 60, 63–64, 36 L.Ed. 991 (1892). Similar reform was accomplished in England in 1898 with the enactment of the Criminal Evidence Act which provided that the accused and his or her spouse were made competent, though not compellable, witnesses. G. Cross and G. Hand, *The English Legal System* 350 (5th ed. 1971).

While the right of the accused to testify is not specifically expressed in the Constitution or Bill of Rights, it has often been referred to in modern Supreme Court cases. *See, e.g., Faretta v. California,* 422 U.S. 806, 819 n. 15, 95 S.Ct. 2525, 2533 n. 15, 45 L.Ed.2d 562 (1975) (constitutional stature of rights not literally expressed in the document but essential to due process includes defendant's right to testify on his own behalf); *Brooks v. Tennessee,* 406 U.S. 605, 612, 92 S.Ct. 1891, 1895, 32 L.Ed.2d 358 (1972) (whether to testify is not only an important tactical decision for a defendant, but also a matter of constitutional right); *Harris v. New York,* 401 U.S. 222, 225, 91 S.Ct. 643, 645, 28 L.Ed.2d 1 (1971) (criminal defendant is privileged to testify in his own defense or to refuse to do so). Our Circuit and others have also recognized the constitutional dimension of the accused's right to testify. *See, e.g., Alicea v. Gagnon,* 675 F.2d 913, 923 (7th Cir.1982) (holding that Fifth, Sixth and Fourteenth Amendments grant a criminal defendant a constitutional right to testify in his own behalf); *United States ex rel. Wilcox v. Johnson,* 555 F.2d 115, 118–19 (3d Cir.1977) (statement by trial court of defendant's constitutional right to testify fairly reflects recognition of such right by federal courts); *United States v.*

*Bentvena,* 319 F.2d 916, 943 (2d Cir.) (the "privilege" has importance similar to the right to be present at one's trial and to present a defense), *cert. denied,* 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963).

What can be said about these references in the case law is plain. Not to be deprived of liberty without due process of law under the Fifth Amendment includes the right to a fair adversary process, a part of which is the right to be present and to take the witness stand in one's own defense. The right to testify on one's own behalf is also derived from the compulsory process clause of the Sixth Amendment. That Amendment, directed generally to the rights of the accused, includes an accused's right to call "witnesses in his favor." Logically included within the right to call any witness is the accused's right to testify himself should he possess evidence in favor of the defense. *See* Westen, *Order of Proof: An Accused's Right to Control the Timing and Sequence of Evidence in His Defense,* 66 Calif.L.Rev. 935, 985 n. 206 (1978). That this unmentioned right is a constitutional one is further fortified by the rule of construction contained in the Ninth Amendment, which provides that "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." The full scope of the specific guarantees is not limited by the text, but embraces their purpose to provide broad freedom from all "arbitrary impositions and purposeless restraints." *See Poe v. Ullman,* 367 U.S. 497, 543, 81 S.Ct. 1752, 1776, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting); L. Tribe, *American Constitutional Law* § 11–3, at 569–70 (1978).

 From all the foregoing, we conclude that the centuries-old right granted an accused to be present and to be heard in person at a federal criminal trial may not be denied without violating the accused's Fifth and Sixth Amendment rights.

 Having concluded that appellant Bifield had a statutory and constitutional right to testify on his own behalf we turn to the record to determine whether Judge

Burns denied him that right. At the end of its findings regarding appellant's tendered duress defense, the district court stated "the defense will not go to the jury." To the extent that appellant now suggests that this language prohibited him from giving any testimony on his own behalf, he reads Judge Burns' statement too broadly. The court merely announced that no evidence as to the asserted defense of duress would be admitted. Nothing in the record even remotely suggests that appellant was denied an opportunity to testify before the jury as to other matters. Reading Judge Burns' ruling inclusively, at most it only denied appellant the opportunity to testify before the jury regarding duress, which she had ruled insufficient as a matter of law.

■■■ We next consider whether the district court's ruling on the duress defense effectively curtailed defendant's right to testify in any meaningful way. A defendant's right to present a full defense, including the right to testify on his own behalf, is not without limits. In responding to the charges against him, an accused must comply with the established rules of procedure and evidence, as must the prosecution, in order to insure a fair trial. *See United States v. Corr,* 543 F.2d 1042, 1051 (2d Cir. 1976). A criminal defendant's right to present a full defense and to receive a fair trial does not entitle him to place before the jury evidence normally inadmissible. *See id.* at 1051–52 (duplicative evidence may be excluded in court's discretion); *United States v. DeStefano,* 476 F.2d 324, 330 (7th

Cir.1973) (court violates accused person's constitutional right to present full defense when it denies him right to call an available witness, but no violation occurs unless witness denied to defendant could have produced relevant and material testimony); *see also Hughes v. Matthews,* 576 F.2d 1250, 1258 (7th Cir.) ("the right of a defendant to present relevant and competent evidence is not absolute and may 'bow to accommodate other legitimate interests in the criminal trial process' "), *cert. denied,* 439 U.S. 801, 99 S.Ct. 43, 58 L.Ed.2d 94 (1978). Once the trial court had determined that the tendered defense failed, evidence going to that defense was irrelevant since it was of no "consequence to the determination of the action." Fed.R.Evid. 401. Thus, the testimony regarding duress which appellant sought to present was properly excluded under Fed.R.Evid. 402. As the Supreme Court said in *Bailey,* juries should not be burdened with testimony as to duress where that defense has already been determined to have failed as a matter of law. 444 U.S. at 416–417, 100 S.Ct. at 637–638. The district court's ruling that evidence legally inadmissible was not to be presented to the jury did not therefore deprive appellant of his constitutional right to testify as to other matters which could properly be received.

## IV

Finally, appellant objects to the district court's charge to the jury concerning his presumption of innocence.[4] Appellant

---

4. The court instructed the jury as follows with respect to that presumption:

In this case, as in all criminal cases, the accused person is presumed to be innocent unless and until he or she is proven guilty beyond a reasonable doubt. This means that at the moment when Mr. Bifield was presented before you for trial, his slate was clean and he stood before you free of any bias, prejudice or burden arising from his position as an accused person.... So insofar as you are concerned, Mr. Bifield when presented before you for trial was innocent and he continues to be innocent until such time, if ever, as the evidence and the matters produced here in this courtroom and in the ordinary course of this trial satisfy you beyond a reasonable doubt that he is guilty.... Mr. Bi-

field does not have to prove that he did not commit the offense with which he is charged. On the other hand, the Government must prove that he did. The burden then is on the Government to prove the Defendant guilty with respect to the crime with which he is charged and the Defendant does not have to prove his innocence.... The presumption of innocence does not have the effect of evidence itself. The only effect it has is to place upon the Government the burden of establishing all the elements necessary to prove guilt beyond a reasonable doubt.... The law does not desire the conviction of innocent people or any person whose guilt upon the evidence is in the realm of reasonable doubt.... It is the sworn duty of Courts and jurors to safeguard the rights of persons

points to that portion of the charge which stated "but the law is made to protect innocent persons and not to protect guilty ones" and claims that it impermissibly shifted the burden of proof to him.

Several other circuits have found similar language objectionable. *See e.g., United States v. Bridges,* 499 F.2d 179, 186 (7th Cir.), *cert. denied,* 419 U.S. 1010, 95 S.Ct. 330, 42 L.Ed.2d 284 (1974); *Reynolds v. United States,* 238 F.2d 460, 462–63 (9th Cir.1956); *Gomila v. United States,* 146 F.2d 372, 373 (5th Cir.1944). *But see Moffit v. United States,* 154 F.2d 402, 404–05 (10th Cir.), *cert. denied,* 328 U.S. 853, 66 S.Ct. 1343, 90 L.Ed. 1625 (1946). In *United States v. Farina,* 184 F.2d 18, 20 (2d Cir.), *cert. denied,* 340 U.S. 875, 71 S.Ct. 121, 95 L.Ed. 636 (1950), this Court held that language of the type used in this charge was not reversible error because when the charge was read as a whole, it was unlikely to lead the jury to believe that the presumption of innocence "could not be invoked until a defendant had dispelled proof of his guilt." Judge Frank, dissenting in *Farina,* concluded that the instruction "may easily" have misled the jury. 184 F.2d at 22–23.

■■■ Concededly, this is a close question. We find, however, that the instructions given by the court, when read in their entirety, were sufficiently clear so as not to dilute the presumption of innocence to which appellant is entitled. The court instructed the jury specifically and repeatedly that Bifield was innocent when presented for trial and continued to be innocent until such time, if ever, as the government proved his guilt beyond a reasonable doubt. The court stressed that Bifield did not have to prove his innocence, but rather that the government had to prove his guilt. We conclude therefore that the charge as given did not impermissibly shift the burden of proof to defendant to dispel proof of his

guilt. We believe it is better practice to avoid using language to the effect that the law is made to protect the innocent and not the guilty. Nonetheless, we are not prepared to say that the present charge constituted reversible error.

Accordingly, the judgment is affirmed.

charged with a crime by respecting the presumption of innocence which the law imputes to every person so charged, but the law is made to protect innocent persons and not to protect guilty ones. If and when that presumption of innocence has been overcome

by evidence, proving beyond a reasonable doubt that an accused person is guilty of the crime charged, then it is the sworn duty of the jury to uphold the law and to render a verdict of guilty.