THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ANGEL CUEVAS, Appellant.

First Department, March 20, 1979

220

APPEARANCES OF COUNSEL

*Todd Stern* of counsel *(William E. Hellerstein,* attorney), for appellant.

*Bruce Allen* of counsel *(Jerrold L. Neugarten* with him on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

## OPINION OF THE COURT

SULLIVAN, J.

On January 4, 1977, at approximately 10:30 P.M. Conrado Nunez, 51 years old, was returning to his home at 515 West 174th Street when he was confronted outside his fourth floor apartment by a man standing four or five feet away, pointing a black handgun at him. As the two stood face-to-face, the gunman said "Give me money." When Nunez, who had $80 on him, raised his hands and replied that he had none, the gunman fired a shot, hitting him in the face,[1] and then fled down the stairs. Nunez recognized the gun wielder as the defendant Cuevas, whom he had known in the neighborhood for over 10 years.

When Mrs. Nunez, who had been waiting for her husband, heard shots outside her apartment, she opened the door and saw him standing by the stairway. Two men were running down the stairs. One was on the third floor, the other on the second. Mrs. Nunez described the man closer to her as tall and skinny with light brown hair in a medium Afro, and wearing a long dark coat with "something white" in the collar. At trial Nunez was also to describe the man with the gun as tall with a "like blond" Afro, and wearing a long, dark coat with a while collar. Mrs. Nunez testified that the other man was tall, slim, with short black hair and wearing "something dark."

The police were summoned and Nunez, accompanied by his wife, was taken to the hospital. Later, Detective Joseph spoke with Nunez, with his wife acting as interpreter.

Detective Joseph then went to defendant's home at 500 West 174th Street. Finding that defendant was not at home, Detective Joseph had a conversation with his parents, explain-

---

1. Providentially, the bullet entered through Nunez' lip and exited from his neck below the right ear, missing the carotid artery by a few inches. Nunez did not suffer any permanent physical injury or continuing disability.

ing that Nunez had identified him as his assailant. Detective Joseph advised the parents that defendant should come to the precinct house to speak to him. It was then approximately midnight.

At about 4 A.M., on January 5, 1977, defendant arrived at the station house. He was taken to the hospital to be viewed by Nunez. After staring at defendant for 8 to 10 seconds, Nunez identified him as his assailant.

Defendant testified in his own behalf. He was an unemployed 19-year-old, who had lived at 500 West 174th Street for the past 9 or 10 years. On the evening of January 4, 1977 between 9:30 and 10:00 P.M., he went to a neighborhood pool hall located on St. Nicholas Avenue, between 173rd and 174th Streets where he played pool from 10:30 to 11:00 P.M. with a friend, Hugo.[2] Defendant was certain that he stopped playing at 11:00 P.M. since he was watching the time because Hugo, who had to get up for work the next morning, had said earlier that he would play only until 11 o'clock. At 11 o'clock, Hugo left for home and defendant went across the street to a restaurant.

When defendant testified that he saw a man in the restaurant, whom he knew as Carlos, the prosecutor objected that since only Hugo was listed in defendant's notice of alibi,[3] reference to any other alibi witness should be prohibited. Defendant argued that any person in his company after he left the pool hall at 11 P.M. was not an alibi witness within the intendment of CPL 250.20, since he was not with that person "at the time of the commission of the crime."

It should be noted that the People had served a handwritten notice on defendant which listed the time of the shooting as 10:45 P.M. The police UF-61 report showed the time of the shooting as 10:55 P.M., and those of the People's witnesses who did testify as to the time of the incident, i.e., Nunez, his wife,

---

2. This is a nickname. Hugo's real name is Otto Rene Gonzales Pacheco. Hugo testified and supported defendant's account that he was playing pool until 11:00 P.M.

3. The People's demand for a notice of alibi read: "Pursuant to Section 250.20 of the Criminal Procedure Law, the People of the State of New York hereby demand that defendant supply the District Attorney of New York County with (a) the place or places where the defendant claims to have been *at the time of the commission of the crime* and (b) the names, residential addresses, the places of employment and the addresses thereof of *every alibi witness upon whom the defendant intends to rely to establish his presence elsewhere than at the scene of the crime at the time of its commission.*" (Emphasis added.)

and Detective Joseph, all stated that the shooting had occurred before 11 o'clock.

The People's objection was sustained on the ground that the testimony of any witness alleged to have been in defendant's company after 11 P.M. was, in effect, an extension of his alibi, and that the name of such witness should have been listed in the notice of alibi. Accordingly, Trial Term excluded the testimony of Carlos and a "friend" whom, defendant later testified, he visited at the friend's apartment from about 11:15 P.M. until 3:30 or 4:00 A.M. In further support of its ruling, Trial Term held that if these two witnesses were not alibi witnesses, as it had concluded, their testimony would still have to be excluded, inasmuch, as defendant's whereabouts after 11 P.M. were irrelevant. Yet, Trial Term later permitted defendant to testify to his activities between 11 P.M. and 4 A.M. The court, however, directed that defendant was to make no reference by name to the two persons in whose company he claimed to have been after leaving the pool hall.

Defendant thereafter resumed his narrative without mentioning the name of anyone he had met following 11 P.M. After he left the pool hall, he had coffee with "somebody" in the restaurant for 10 or 15 minutes and then went to a "friend's" house where he stayed for three or four hours until he returned home to his parents' apartment sometime between 3:30 or 4:00 A.M. Defendant testified that although he had not worn his long dark coat with the white fur collar earlier that night, he was wearing it when he went to the station house and, of course, when Nunez identified him at the hospital.

After a one-day deliberation, the jury convicted defendant of attempted murder in the second degree and assault in the second degree. In our view, there were two errors of sufficient import as to have deprived defendant of a fair trial. Thus, a new trial is warranted.

■ It was error to exclude the testimony of the two witnesses whom defendant had hoped to call in support of his testimony concerning his activities after 11 P.M. This testimony was relevant since defendant had accounted for his whereabouts at the time of the shooting by testifying to his activities at the pool hall until 11 P.M. At least as to this time element, for whatever it was worth, his testimony was corroborated by the evidence of Hugo, the alibi witness. It would have been quite natural for the jury to wonder about defen-

dant's activities from 11 P.M., shortly after the shooting, until 4 A.M., when he returned home. He had a right to account for his actions during that time span, and to show that his conduct and demeanor were inconsistent with the behavior which might be expected of a person who had just committed a heinous crime. If nothing else, these witnesses could have testified to the color and type of the outer garment defendant was wearing and perhaps supported his claim that he was not wearing the long black coat with the white fur collar earlier that evening. Defendant was denied this opportunity by the exclusion of these witnesses.

Moreover, their testimony was important to dispel any inference of consciousness of guilt which might have flowed from defendant's unavailability until 4 A.M.[4] The relevancy of such testimony on this issue was all the more significant since the People had been permitted to show that defendant was not home at midnight when Detective Joseph went looking for him at his apartment.

As a result of Trial Term's ruling, defendant was left to testify to his activities after 11 P.M. without the support of his witnesses. This factor took on critical significance when the court charged, properly so, that defendant was an interested witness, as a matter of law. Furthermore, in the course of his testimony, defendant was not allowed even to mention the names of those he was with after 11 P.M., except for a single reference to Carlos. Thus, he had coffee with "somebody" and later went to the house of "somebody" who was "a friend of mine." Whatever one's view as to whether Carlos and the "friend" were alibi witnesses, it was error to bar even a mention of their names since the sanction for noncompliance with the notice of alibi demand does not include a prohibition against a defendant testifying as to where and with whom he was at a certain relevant time. (See CPL 250.20, subd 3.)

■ Finally, the knowledge that he could not call either Carlos or his friend, or indeed even mention their names would tend to have a chilling effect on defendant's testimony as to the events after 11 P.M. By testifying at length about

---

4. While the jury was not specifically charged on the inference of consciousness of guilt which might be drawn from evidence of flight (see *People v Stilwell,* 244 NY 196; *People v Yazum,* 13 NY2d 302, 304; also *People v Limage,* 57 AD2d 906, affd 45 NY2d 845) the inference is, nevertheless, a logical one which the jury might well have drawn in the exercise of its common sense.

these events, defendant would have run the risk of a jury wondering why there were no witnesses to confirm this aspect of his narrative. The testimony of a defendant's witness should never be prospectively excluded as irrelevant unless his offer of proof is in palpably bad faith. *(People v Gilliam,* 37 NY2d 722, revg 45 AD2d 744 [on the dissenting opn of HOPKINS, J.]; *People v Hepburn,* 52 AD2d 958.)

■ Nor should the testimony of these two witnesses have been excluded for failure to list their names in the notice of alibi. CPL 250.20 (subd 1), which prescribes the procedure by which the People may ascertain whether a defendant intends to offer an alibi defense and elicit the particulars thereof, sets forth the critical time frame covered by the defense of alibi. It requires that where a defendant plans to assert that *"at the time of the commission of the crime charged* he was at some place or places other than the scene of the crime" (emphasis added) he must, pursuant to demand, furnish the names and addresses of the witnesses he intends to call to establish such a defense. The sanction for failure to serve a notice of alibi or to specify an alibi witness therein is exclusion of the witness' testimony. (CPL 250.20, subd 3.) Exclusion, however, is not mandatory. In its discretion, the court may permit the witness to testify, but before doing so it must, upon application of the People, grant an adjournment not in excess of three days. (CPL 250.20, subd 3.)

It seems clear that the friend's testimony was in no way calculated to "establish [defendant's] presence elsewhere than at the scene of the crime at the time of its commission." This testimony was intended to cover the time span from 11:15 until defendant's return home at 4:00 A.M. As already noted, the prosecutor had originally listed the time of the crime as 10:45 P.M. and the People's evidence had uniformly placed the time of the shooting as before 11 o'clock. Furthermore, the People's demand for a notice of alibi virtually tracked the statutory language and demanded the names "of every alibi witness upon whom the defendant intends to rely to establish his presence elsewhere than at the scene of the crime at the time of its commission." Thus, there was no obligation to list the friend as an alibi witness. Barring this testimony on the ground of noncompliance with CPL 250.20 was inconsistent with the statute's limitation of the application of its provisions to only those witnesses who, it is claimed, would support a

defense that "at the time of the commission of the crime",[5] the defendant was at some place or places other than the scene of the crime.

The status of the witness Carlos is not all that clear. Since his testimony would have covered the time beginning at 11 P.M., after the crime, he would not appear to be, on a strict interpretation of the statute, an alibi witness. Yet, because of the closeness in time of the shooting to his alleged meeting with defendant in the restaurant, his testimony might have supported defendant's version that at the time of the crime he was not at 515 West 174th Street. Thus, the better practice would have been to list him as an alibi witness. But even if his status as a witness were alibi or extension of alibi, as Trial Term concluded, we believe that, in the exercise of discretion, the court should have allowed Carlos to testify in accordance with subdivision 3 of the statute. He was important to the case, and the failure to name him was not based on an entirely unreasonable reading of the statute or of the People's demand for a notice of alibi. Moreover, permitting Carlos to testify would not have prejudiced the People. As already noted, where the court allows an unlisted alibi witness to testify, there is provision for the allowance of adequate preparation time to the People by the grant of an adjournment not to exceed three days. (CPL 250.20, subd 3.)

■ Permitting an unlisted alibi witness to testify where, arguably, he is not an alibi witness is in accord with the long-established rule that statutes which impinge on fundamental rights must be narrowly construed. (See, e.g., *Smith v United States,* 360 US 1, 9; see, also, *People v Trowbridge,* 305 NY 471; *People ex rel. Cosgriff v Craig,* 195 NY 190.)

■ In the circumstances presented, Trial Term's refusal to permit defendant's witnesses to testify violated his constitutional right to call witnesses in the presentation of his defense. *(Chambers v Mississippi,* 410 US 284, 294, 302; *Matter of Oliver,* 333 US 257, 273; *People v Foy,* 32 NY2d 473, 478.) Reversal is mandated.

■ There is one other error of sufficient gravity to warrant reversal. Police Officer McNamee, who had been one of the first officers to arrive at the scene, and who had accompanied

---

5. This is not a case where the time of the commission of a crime is only vaguely known or is in doubt. In such circumstances, a defendant would be required to name as alibi witnesses all those who would testify to his whereabouts during the period in which the crime might have been committed.

Nunez and his wife to the hospital, was called, not by the People, but by defendant. McNamee had prepared a UF-61 report, which was admitted in evidence, and which recorded a physical description of the assailant that on its face did not fit defendant. Defendant is 6 feet 2 inches tall; his hair is light brown and worn in an Afro style. The report described the perpetrator as 5 feet 9 inches in height, with black hair. The perpetrator's name was recorded as Cuevas and his address as 500 West 174th Street. His clothing was listed as "unknown". McNamee testified that neither Nunez nor his wife ever mentioned a second person.

These entries were significant in the light of Mrs. Nunez' testimony that she saw two men running down the stairs after the shooting. She had described one of them as tall and slim with short black hair. Nunez himself had also testified that just before he reached the fourth floor landing he had passed another man, whom he described as tall and light skinned with black hair.

On cross-examination, McNamee disavowed the physical description recorded in the UF-61, claiming that his conversation with Nunez had taken place at the hospital while the doctors and nurses were examining him, that it was "very brief", and that Nunez was "quite shaken up and upset." McNamee testified further that he had "not really" understood Nunez' response to his question about defendant's hair color.

This disavowal was critical. If the jury had accepted the UF-61 as an accurate recordation of Nunez' description of his assailant, the disparity might have been sufficient to create a reasonable doubt, especially since another defense witness, Marcos Diaz, the superintendent at Nunez' apartment building, had testified that Nunez occasionally wore glasses and had difficulty seeing at close range.[6]

On redirect examination defendant attempted to probe McNamee's disavowal but was hampered by objections made by the People and sustained by the court:

"Q: But you were able to understand and address, 500 —

"A: (Int'g.) Basically, yes.

"Q: Officer, he was able to talk, wasn't he?

"A: Not like me and you.

6. Nunez had previously testified that he never wore glasses.

"Q: But he was able to communicate with you, is that correct?

"[PROSECUTOR]: Objection.

"THE COURT: Sustained, as to form.

"Q: Officer, did you have any trouble understanding him when he said hair black?

"[PROSECUTOR]: Objection.

"THE COURT: Sustained.

"Q: Officer, did he say to you that the defendant's hair or the person who shot him, his hair was black?

"[PROSECUTOR]: Objection.

"THE COURT: I think we've explored this as exhaustively as the circumstances require.

"[DEFENDANT'S ATTORNEY]: Your Honor, I'd like to go over this again, because there were statements made by the police officer—well, I'd rather not say.

"THE COURT: The jury heard this testimony, [counsel].

"Q: You were able to get a description from him, there's no question about that, is there?

"[PROSECUTOR]: Objection.

"THE COURT: Sustained.

"Q: Were you able to get a description of the alleged perpetrator from Mr. Nunez, yes or no.

"[PROSECUTOR]: Objection.

"THE COURT: I would remind you, this is the defendant's witness.

"[DEFENDANT'S ATTORNEY]: I would ask, on the basis of his prior testimony —

"THE COURT: (Int'g.) May I remind you that it is the defendant's witness.

"[DEFENDANT'S ATTORNEY]: Then I would ask that he be called a hostile witness.

"THE COURT: Denied * * *

"Q: Officer, you stated a moment ago that you did not understand clearly the complainant, Mr. Nunez, is that correct?

"A: That's correct.

"Q: But you did understand him, and on the basis of that, you did make recordings on the UF-61, is that correct?

"[PROSECUTOR]: Objection.

"THE COURT: Sustained, as to form.

"Q: When you had your conversation with Mr. Nunez, on that basis you put down the entry on your 61; is that correct?

"A: That's correct.

"Q: And you believed those entries to be correct, is that correct?

"[PROSECUTOR]: Objection.

"THE COURT: Sustained.

"A: That's ridiculous.

"Q: Officer, who told you about apartment 4?

"A: I just stated, from what I could gather, that's where the possible perpetrator lived.

"Q: Where did you get the apartment number from?

"A: From the wife and Mr. Nunez, from what I could get out of him.

"Q: Mr. Nunez stated he lived in Apartment 4?

"[PROSECUTOR]: Objection.

"THE COURT: Sustained.

"Q: Did Mr. Nunez say apartment 4?

"A: He said 4.

"Q: Did Mr. Nunez say black with regard to hair?

"[PROSECUTOR]: Objection.

"THE COURT: Sustained.

"Q: Mr. Nunez say five-nine with regard to height?

"[PROSECUTOR]: Objection.

"THE COURT: Sustained.

"Q: Officer, you're trained in interviewing people, is that correct?

"THE COURT: Sustained."

The court's rulings resulted in an unwarranted curtailment of defendant's redirect examination, and deprived him of a key opportunity to discredit Nunez' identification, which was the only issue in the case. By undermining the UF-61 description on cross-examination, McNamee dispelled whatever doubt may have been created by the discrepancy between that description and defendant's actual physical characteristics. The purpose of the questions was to clarify McNamee's testimony by showing that the source of the UF-61 description of the assailant was Nunez. The questions were wholly within the scope of proper redirect examination, since a party may

always rehabilitate his own witness. (See, e.g., *People v Buchanan,* 145 NY 1, 23-24; *People v Regina,* 19 NY2d 65.) The improper restriction of the re-examination of Officer McNamee so thwarted defendant's efforts to challenge Nunez' identification of him as the assailant as to deprive him of a fair trial.

In view of our holding, we do not find it necessary to reach the other cited errors.

Accordingly, the judgment, Supreme Court, New York County (ALEXANDER, J.), rendered January 25, 1978, convicting defendant of the crimes of attempted murder in the second degree and assault in the second degree and sentencing him thereupon to concurrent indeterminate terms of two to six years on each, should be reversed, on the law and as a matter of discretion in the interest of justice, and the matter remanded for a new trial.

SILVERMAN, J. (concurring). While I think the Trial Judge's rulings were well within the range of his permissible discretion, the end result was a trial so truncated that on the whole I think the interest of justice might be better served by having a new trial.

BIRNS, J. P., EVANS and FEIN, JJ., concur with SULLIVAN, J.; SILVERMAN, J., concurs in an opinion.

Judgment, Supreme Court, New York County, rendered on January 25, 1978, reversed, on the law and as a matter of discretion in the interest of justice, and the matter remanded for a new trial.