**Charles WALKER, Petitioner,**

v.

**David HOOD, Superintendent, Otisville Correctional Facility, and Robert Abrams, Attorney General of the State of New York, Respondents.**

No. 86 Civ. 3347 (RJW).

United States District Court,
S.D. New York.

Feb. 9, 1988.

Charles Walker, pro se.

Robert Abrams, Atty. Gen. of the State of N.Y., New York City, for respondents; Eugene Murphy, Asst. Atty. Gen., New York City, of counsel.

## OPINION

ROBERT J. WARD, District Judge.

Charles Walker petitions this Court *pro se* for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. By order dated February 6, 1987, the petition was referred to the Honorable James C. Francis, IV, United States Magistrate, pursuant to 28 U.S.C. § 636(b)(1) and Rule 4 of the Local Rules for Proceedings Before Magistrates, to hear and report. On August 26, 1987, Magistrate Francis filed his Report and Recommendation (the "Report"), in which he recommended that the petition be dismissed in its entirety, because it contained both exhausted and unexhausted claims.

Petitioner filed his objections to the Report on September 9, 1987, and respondents responded to petitioner's objections by letter filed with the Court on September 25, 1987. For the reasons hereinafter stated, the Court concludes that it is appropriate to consider the merits of the three grounds for relief set forth in the petition. The Court has considered petitioner's contentions *de novo,* and determined that petitioner's first ground warrants the relief requested. Accordingly, petitioner's writ is granted and respondents are ordered to provide petitioner with a new trial.

## BACKGROUND

Petitioner Walker challenges a jury verdict in the Supreme Court of New York, New York County (Williams, J.). Trial commenced on November 11, 1982. Walker was convicted of two counts of robbery in the first degree, attempted robbery in the first degree, attempted murder in the second degree, criminal possession of a weapon in the second degree and grand larceny in the second degree. He was sentenced January 17, 1983 to a prison term of four to eight years on the first degree robbery count to run consecutively to the following concurrent prison sentences: two to six years for attempted first degree robbery, four to eight years for attempted murder, two to six years for criminal possession of a weapon and one to three years for grand larceny.[1] The Appellate Division, First Department, affirmed the conviction without opinion on May 28, 1985. The New York Court of Appeals on August 28, 1985 denied Walker's request for leave to appeal.

Walker's habeas corpus petition sets forth three grounds for relief. First, Walker asserts that the trial judge, in misapplying the New York State Notice of Alibi Statute and instructing the jury to disregard Walker's alibi testimony, violated Walker's right to testify on his own behalf. Second, Walker argues that two photographic show-ups conducted at trial violated his right to due process. Finally, Walker contends that the admission of an appointment book to impeach him on a collateral matter was highly prejudicial, depriving him of his due process right to a fair trial.

In his Memorandum of Law, filed May 12, 1987, Walker made additional arguments challenging his conviction. Walker argued that the erroneous exclusion of transcripts from the "911" police emergency calls following the crime denied him his right to confront the evidence against him and to present exculpatory evidence to the jury. In addition, Walker claimed that the suggestiveness of the victim's identification of him at the crime scene, and the refusal of the trial judge to hold a *Wade* hearing to determine the extent of the suggestiveness, violated his right to due process.

## DISCUSSION

To accept the report and recommendation of a magistrate, to which no timely objection has been made, a district court need only satisfy itself that there is no clear error on the face of the record. *See* Rule 72, Fed.R.Civ.P., Notes of Advisory Committee on Rules (citing *Campbell v. United States District Court*, 501 F.2d 196, 206 (9th Cir.), *cert. denied*, 419 U.S. 879, 95 S.Ct. 143, 42 L.Ed.2d 119 (1974)). However, when timely objection has been made to a portion or portions of a magistrate's report, the district judge must "make a *de novo* determination ... of any portion of the magistrate's disposition to which specific written objection has been made." Rule 72(b), Fed.R.Civ.P.; *see also* 28 U.S.C. § 636(b)(1). The judge may then accept, reject, or modify, in whole or in part, the magistrate's proposed findings and recommendations. 28 U.S.C. § 636(b)(1).

A district court's obligation to make a *de novo* determination of properly contested portions of a magistrate's report does not require that the judge conduct a *de novo* hearing on the matter. *United States v. Raddatz*, 447 U.S. 667, 676, 100 S.Ct. 2406, 2412–13, 65 L.Ed.2d 424 (1980). It is sufficient that the district court "arrive at its own, independent conclusion about those portions of the magistrate's report to which objection is made...." *Hernandez v. Estelle*, 711 F.2d 619, 620 (5th Cir.1983). To this end, the court must "exercise ... sound judicial discretion with respect to whether reliance should be placed on [the magistrate's] findings." *American Express Int'l Banking Corp. v. Sabet*, 512 F.Supp. 472, 473 (S.D.N.Y.1981),

---

1. The conviction on one of the robbery counts was set aside on the People's motion. On January 21, 1983, Walker's sentence was modified, solely with respect to the attempted murder count, to a term of two and two-thirds to eight years, because he was not a predicate felon, and because attempted murder in the second degree did not constitute an armed felony.

*aff'd mem.*, 697 F.2d 287 (2d Cir.), *cert. denied*, 459 U.S. 858, 103 S.Ct. 129, 74 L.Ed.2d 111 (1982).

### 1. *Exhaustion*

■ Applications for habeas corpus relief may not be addressed on the merits by a federal court until the petitioner has exhausted available state court remedies. *Duckworth v. Serrano*, 454 U.S. 1, 3, 102 S.Ct. 18, 19, 70 L.Ed.2d 1 (1981).[2] "Mixed" petitions, those containing both exhausted and unexhausted claims, must be dismissed in their entirety. *Rose v. Lundy*, 455 U.S. 509, 522, 102 S.Ct. 1198, 1205, 71 L.Ed.2d 379 (1982); *Holland v. Scully*, 797 F.2d 57, 64 (2d Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 237, 93 L.Ed.2d 162 (1986).

[5] In concluding that Walker had presented a mixed petition, Magistrate Francis considered not only the three grounds set forth in the petition itself, but also the additional arguments that Walker presented in his Memorandum of Law, filed May 12, 1987. The Magistrate expressly determined that Walker's three original grounds for relief, those set forth in his petition, were exhausted, but found that the two additional arguments were not exhausted. Report at 4.

The Magistrate certainly acted appropriately in construing Walker's pleadings liberally in light of his *pro se* status, *see Haines v. Kerner*, 404 U.S. 519, 520–21, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972) (*per curiam*), and in considering all arguments raised, even if technically, they may not have been properly pleaded. In his Objections to the Report, however, Walker argues that he had not intended to add additional grounds for relief in his Memorandum of Law, but merely intended to bolster his three original grounds by presenting new supporting arguments. The rule requiring liberal construction of a *pro se* litigant's pleadings should not be applied to Walker's disadvantage. Accordingly, this Court will consider here only petitioner's three original grounds.[3] The new arguments raised in petitioner's Memorandum of Law will be considered to the extent they shed light on the grounds for relief properly before the Court.

Because respondents did not object to Magistrate Francis' determination that Walker's three original claims had been exhausted, and because there is no clear error on the face of the record, this Court adopts Magistrate Francis' determination of the issue. Because all the claims before the Court have been exhausted, the Court concludes that the petition is properly before it, and now proceeds to a determination of the merits of the petition.

### 2. *Petitioner's Right to Present his Alibi Testimony to the Jury*

The Court of Appeals for the Second Circuit has unequivocally recognized the right of an accused to testify in his own defense and to present his version of events to the jury.[4] This right is derived

---

**2.** The requirement that a person in state custody must exhaust his or her state remedies as a predicate to instituting an application for federal habeas relief is codified at 28 U.S.C. § 2254(b). That section provides in part:

> An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the application has exhausted the remedies available in the courts of the State....

**3.** The Court's reading of the petition can be supported in either of two ways. Petitioner's Memorandum of Law can be construed as not raising any new grounds for relief at all. Alternatively, petitioner's Objections to the Report can be construed as having withdrawn additional grounds raised in this Memorandum of Law.

**4.** The Supreme Court, though it has not expressly held that a criminal defendant has a right to testify in his defense, appears to assume the existence of the right, and has cited with favor lower court opinions recognizing the right. Most recently, in *Nix v. Whiteside*, 475 U.S. 157, 164, 106 S.Ct. 988, 993, 89 L.Ed.2d 123 (1986), for example, the Court declared:

> Although this court has never explicitly held that a criminal defendant has a due process right to testify in his own behalf, cases in several Circuits have so held, and the right has long been assumed. We have also suggested that such a right exists as a corollary to the Fifth Amendment privilege against compelled testimony.

*Id.* (citations omitted). *See also, e.g., Faretta v. California*, 422 U.S. 806, 819 n. 15, 95 S.Ct. 2525, 2533 n. 15, 45 L.Ed.2d 562 (1975) (an accused's right to testify on his own behalf, though not

from the compulsory process clause of the Sixth Amendment and the due process requirements of the Fifth Amendment, applied to the states through the Fourteenth Amendment, and finds additional support in the Ninth Amendment.

> Not to be deprived of liberty without due process of law under the Fifth Amendment includes the right to a fair adversary process, a part of which is the right to be present and to take the witness stand in one's own defense. The right to testify on one's own behalf is also derived from the compulsory process clause of the Sixth Amendment. That Amendment, directed generally to the rights of the accused, includes an accused's right to call "witnesses in his favor." Logically included within the right to call any witness is the accused's right to testify himself should he possess evidence in favor of the defense. That this unmentioned right is a constitutional one is further fortified by the rule of construction contained in the Ninth Amendment.... The full scope of the specific guarantees is not limited by the text, but embraces their purpose to provide broad freedom from all "arbitrary impositions and purposeless restraints."

*United States v. Bifield,* 702 F.2d 342, 349 (2d Cir.) (citations omitted), *cert. denied,* 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983). *See also United States v. Bentvena,* 319 F.2d 916, 943 (2d Cir.) (the "privilege" to testify in one's own behalf has importance similar to the right to be present at one's trial and to present a defense), *cert. denied,* 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963).

■ The accused's right to testify is implicated not only where he is totally precluded from taking the stand, *e.g., United States v. Butts,* 630 F.Supp. 1145, 1148 (D.Me.1986); *see also United States v. Walker,* 772 F.2d 1172, 1178 & n. 10 (5th Cir.1985) (abuse of discretion for trial judge to refuse to reopen case in order to permit defendant to testify), but also if the scope of his testimony is restricted in any way. *United States v. Bifield, supra,* 702 F.2d at 350 (defendant precluded from testifying as to his duress defense). *Accord United States v. Brown,* 785 F.2d 587 (7th Cir. 1986) (defendant precluded from testifying as to necessity defense); *Alicea v. Gagnon,* 675 F.2d 913 (7th Cir.1982) (alibi testimony precluded).

■ The right to testify, however, is not without its limits. In presenting his case, a criminal defendant must comply with the established rules of procedure and evidence. There is no constitutional right to present inadmissible evidence. *United States v. Bifield, supra,* 702 F.2d at 350. A court will not commit reversible error if it excludes only testimony that is merely cumulative or irrelevant. Thus, in *Bifield,* it was not improper for the trial judge to preclude the defendant from testifying as to his duress defense, after the court had ruled that the defense was insufficient as a matter of law. The court had properly ruled that the proffered testimony was irrelevant and therefore inadmissible. *Id.* Similarly, in *United States v. Brown, supra,* 785 F.2d 587, the trial court did not commit reversible error where it refused to permit the defendant to answer a question that may have related to a necessity defense or an insanity defense, where the court had ruled the necessity defense insufficient as a matter of law and had permitted the presentation of ample expert testimony in support of the insanity defense. *Id.* at 589–90.[5]

literally expressed in the document, is essential to due process of law in a fair adversary process and is of constitutional stature); *Brooks v. Tennessee,* 406 U.S. 605, 612, 92 S.Ct. 1891, 1895, 32 L.Ed.2d 358 (1972) ("Whether the defendant is to testify is an important tactical decision as well as a matter of constitutional right."); *Harris v. New York,* 401 U.S. 222, 225, 91 S.Ct. 643, 645, 28 L.Ed.2d 1 (1971) ("Every criminal defendant is privileged to testify in his own defense, or to refuse to do so.").

**5.** Recognizing that an accused's right to testify is derived at least in part from the compulsory process clause of the Sixth Amendment, it is instructive to consider other compulsory process cases when determining the scope of the right to testify. Thus, in *Singleton v. Lefkowitz,* 583 F.2d 618 (2d Cir.1978), *cert. denied,* 440 U.S. 929, 99 S.Ct. 1266, 59 L.Ed.2d 486 (1979), the petitioner challenged the refusal of the trial court to grant a continuance in order to allow the defense to locate a witness. The court's

In the instant case, the trial justice instructed the jury to disregard petitioner's testimony regarding his whereabouts at the time of the crimes charged. Petitioner had been charged with two separate incidents that occurred during the evening of February 19, 1982.

### A. People's Evidence

At about 9:30 p.m., Harry Habib, the sole attendant at a multi-story parking garage on East 16th Street in Manhattan, was approached by a man he had never seen before. The man pulled a gun from his brown, hooded jacket and demanded that Habib open the door to the office. Transcript of State Court Trial conducted from November 28, 1982 until December 1, 1982 ("Tr.") at 161–65, 167–68, 172–73, 233. Habib complied, and the robber asked, "Where's the money?" Tr. at 173. Habib gave the robber from a desk drawer petty cash amounting to no more than $25, and the robber asked "Was that it?" Tr. at 162, 173–75. Habib then offered the money from his pockets and the television from the office, but the robber refused, instead ordering Habib to accompany him "upstairs." Tr. at 175. As they stepped out of the office, Habib ran out into the street. The robber did not pursue him, but ran into the garage. Tr. at 175–76. Police officers, responding to a radio call at about 9:45, met Habib. Tr. at 110–12. They searched the garage, but found no one. Tr. at 112–13.

At 11:30 that night, as Habib was preparing to enter his car and leave the garage for the night, he was intercepted by the same man who had robbed him earlier. Tr. at 179–83. Habib was certain that he recognized the robber. Tr. at 247. The man grabbed Habib by the shoulders, put the gun to his face, and asked where the rest of the money was. Tr. at 183. Ben Bernard, a co-worker of Habib's, and Jimmy Walker, a security guard from the building next door, looked on as Habib struggled with his assailant for control of the gun. Tr. at 47, 179–81, 183–84, 189–90. Three

shots were fired, while Habib had his hands on the muzzle of the gun and the robber had two hands gripping the revolver. Tr. at 47, 260–61. After the second shot, Bernard ducked behind a car and then ran into the street to get help. Tr. at 48, 61. Habib let go of the gun and fell to the floor. Tr. at 63, 190–96, 265–66. The robber then stood in front of Habib, and asked again where the rest of the money was. Tr. at 195–96. Habib replied that he had given the money to Bernard, whereupon the robber immediately turned and ran after Bernard. Tr. at 195–96. Habib then got up, went outside and proceeded in a direction opposite to Bernard. Tr. at 196–97.

When Bernard returned to the garage, he observed Habib's car, a beige BMW, being driven into the "hole" at the rear of the garage. Tr. at 46, 51–52. Although the lighting in the back of the garage was not good, Bernard was positive he recognized the robber as he stepped out of the car. Bernard explained that he recognized the "fur coat." Tr. at 73, 75–76. The man disappeared into the back of the garage. Tr. at 52. A few minutes later a black Datsun 280Z, kept on the main floor of the garage, started backing out, but kept stalling and came to a halt halfway out into the street. Tr. at 52–53. Habib could not clearly see what happened next, but Jimmy Walker approached the car and there was some altercation inside. Tr. at 54–55. The man in the Datsun got out of the car and Bernard grabbed him in a wrestle-hold as the police arrived. Tr. at 55.

When police officer Thomas Stedina arrived at the scene, he observed three men on the sidewalk next to a parked car. Tr. at 445. Bernard had petitioner in a "bear hug" and Jimmy Walker was standing two or three feet away. Tr. at 292, 445. Bernard shouted, "He shot my friend." Tr. at 292. Stedina separated Bernard and petitioner, searched petitioner, and removed a .38 caliber revolver from a shoulder holster concealed beneath petitioner's jacket, which the officer described as a "brown

---

refusal to grant the continuance violated the petitioner's right to compulsory process, since the petitioner had made a sufficient showing

that the witness "would have provided favorable evidence which was neither cumulative nor irrelevant." *Id.* at 623.

suede jacket with a fur collar." Tr. at 56–57, 202, 293. The gun removed from petitioner had five spent cartridges and one apparently live round, all of which were .38 caliber. Tr. at 420–21, 424. At some point, Stedina removed a white glove from petitioner's left hand and another glove from the garage floor. Tr. at 316. He also recovered from petitioner a $5 bill, 12 $1 bills, and 21 quarters, and a memo book. The money was not produced in court. Tr. at 323–25.

Police Officer Santana frisked Jimmy Walker, who had been acting suspiciously. Tr. at 134–35. Jimmy Walker told Santana that a robbery had just taken place, Tr. at 135, and Santana went down the block to assist Habib. Tr. at 135–36. Habib was later taken to the hospital where he was treated for gunshot wounds to his stomach, left arm and right pinkie. Habib was discharged from the hospital after one week and two days. Tr. at 136–37, 145, 203–07, 373–75.

### B. Petitioner's Alibi Evidence

In his defense, petitioner testified that on the night in question, he had gone home to 1880 Valentine Avenue in the Bronx, where he had supper with his girlfriend Joan Epps and her daughter. Tr. at 514–15. He remained at home, watching television until 8:30 or 8:45 p.m. Tr. at 515. At about 9:20 or 9:30 he left for the apartment of Carmela Smith, who lived about eight blocks away, also in the Bronx. Tr. at 516. Petitioner arrived at Ms. Smith's apartment at about 9:45 and visited her for about an hour, when he left for Dixon's Lounge, a bar in the Bronx. Tr. at 516–17. At the bar, Clement Knight, a friend of petitioner's, asked petitioner to drive him and his girlfriend to the girlfriend's home on East 16th Street in Manhattan. Tr. at 517–518. The trio left the bar after 11:00 p.m. Tr. at 518.

Petitioner waited in his car on 16th Street while Mr. Knight walked his girlfriend upstairs. Tr. at 523. Petitioner and Knight were planning to return to the Bronx together. Petitioner heard sounds like a car backfiring, then saw a white man running toward Park Avenue South and then two black men going in the opposite direction toward Irving Place. They entered a building next to the garage. Tr. at 523–24. One had a long coat on and the other was "bent over" and had a short jacket. Petitioner later learned that the second man was Habib. Tr. at 553–54. Petitioner then got out of his car to investigate, and walked down the block. He saw one of the men return to the garage while the other ran across the street and knocked on the glass doors of a building, yelling something to the people inside. Tr. at 524. Petitioner then heard tires screeching and saw the black Datsun backing out of the garage. Tr. at 525. The man who had been yelling across the street looked at the car and started running towards Irving Place South. Tr. at 525. The car then stopped and a man jumped out and ran back into the garage. Tr. at 525.

When petitioner reached the garage, no one was out in front. Tr. at 525. The door on the driver's side of the Datsun was open, and petitioner reached in to pick up a man's black handbag that was on the passenger seat. Tr. at 525. As he backed out of the car someone grabbed him from behind, pinning his hands to his sides. Tr. at 525–26. The police arrived soon after and took petitioner into custody. Tr. at 526–27.

Carmela Smith corroborated petitioner's alibi, testifying that he had called her at about 9:30 p.m. on February 19, 1982 and said he would come over. Tr. at 561, 563. He visited with her at her apartment for about an hour from approximately 9:45 until 10:45 and then left. Tr. at 561. On cross-examination, Ms. Smith testified that she and petitioner usually saw each other on Fridays at about the same time. Tr. at 564, 572. She specifically remembered checking her watch after he called that night, and that it was about 9:30. Tr. at 564. She was sure she saw petitioner on the night he was arrested, because she spoke with petitioner's sister a week or two later, who told her about the arrest. Tr. at 563–64.

### C. The Nullifying Charge

■ After petitioner had testified as to his activities through 11:00 p.m. on Febru-

ary 19, the prosecutor objected at side-bar to defendant's testimony "which is elicited to put him in a place other than the scene of the crime at the time the crimes are charged to have been committed." Tr. at 518. The prosecutor represented that a demand for notice of alibi was timely served and that no alibi notice had been submitted. Tr. at 518, 521.[6] Petitioner's attorney argued that petitioner had a right to testify as to what he did that night. Tr. at 518–19.[7] The court ruled, however that a nullifying instruction was appropriate, explaining "I must do it. I have no alternative." Tr. at 521. The court offered, and the parties agreed, that the nullifying charge would be postponed until the time of the charge. Tr. at 522. When Ms. Smith was subsequently called as a defense witness, she was permitted to testify without objection.

Near the conclusion of the lengthy jury instructions, shortly after the close of the court's analysis of the indictment, Tr. at 684–717, the court delivered the following nullifying charge.

> Now, members of the jury, in reference to certain portions of the defendant's testimony about certain activities of his prior to eleven p.m. on the evening in question in this case, the Court instructs you to disregard any testimony as to his activities prior to eleven p.m. And when I said that, you are not to draw any inferences one way or the other against either party to this lawsuit.

Tr. at 718.

Respondents argue that the nullifying charge, though in error, did not deprive petitioner of his constitutional rights. Petitioner's alibi, however, was his only defense. It was, then, crucial to the presentation of his case. Because Habib claimed that his assailant during the 11:30 incident was the same man who had robbed him earlier in the evening, the proffered alibi testimony was relevant to rebut all of the charges against him. The instruction to disregard petitioner's testimony might be considered as even more damaging to petitioner than a prior prohibition against such testimony, for it likely had the effect of discrediting in the eyes of the jurors the rest of petitioner's testimony. Furthermore, because of its ambiguous wording, the instructions might reasonably have been construed as directing the jurors to disregard not only petitioner's testimony regarding his activities prior to 11:00 p.m., but to disregard Ms. Smith's testimony as well.[8] Petitioner's proffered testimony,

---

**6.** New York's notice of alibi statute, N.Y. Crim. Proc.Law § 250.20 (McKinney 1982), provides in part:

> 1. At any time, not more than twenty days after arraignment, the people may serve upon the defendant or his counsel, and file a copy thereof with the court, a demand that if the defendant intends to offer a trial defense that at the time of the commission of the crime charged he was at some place or places other than the scene of the crime, and to call witnesses in support of such defense he must, within eight days of service of such demand, serve upon the people, and file a copy thereof with the court, a "notice of alibi," reciting (a) the place or places where the defendant claims to have been at the time in question, and (b) the names, the residential addresses, the places of employment and the addresses thereof of every such alibi witness upon whom he intends to rely. For good cause shown, the court may extend the period for service of the notice.

> \* \* \* \* \* \*

> 3. If at the trial the defendant calls such an alibi witness without having served the demanded notice of alibi, or if having served such a notice he calls a witness not specified therein, the court may exclude any testimony of such witness relating to the alibi defense. The court may in its discretion receive such testimony, but before doing so, it must, upon application of the people, grant an adjournment not in excess of three days.

**7.** The defense further argued that the prosecutor's objection was not timely, since the testimony was already before the jury. Tr. at 521.

**8.** Petitioner argued on direct appeal that the erroneous jury instruction constituted constitutional error, not only because it impermissibly deprived petitioner of his own right to testify, but also because it undermined the effectiveness of Ms. Smith's testimony. Respondents argue that the challenge to the jury instruction based on its effect on Ms. Smith's testimony was not properly preserved for appeal because at trial petitioner failed to object to the instruction on that basis.

New York law requires that objections be made contemporaneously in order to assure appellate review. New York Crim.Proc.Law § 470.05(2) (McKinney 1983) (amended 1986).

therefore, cannot rightly be considered cumulative, irrelevant, or otherwise inadmissible.[9] He was entitled, under his right to testify, to present to the jury his story of the events of February 19, 1982.

### D. Balancing Test

Ordinarily, where a court has determined that an accused's right to compulsory process has been infringed, it then undertakes to balance the accused's Sixth Amendment right to present the precluded testimony against the state's interest in the orderly administration of justice and in enforcing its procedural and evidentiary rules. The Second Circuit recently applied such a balancing test in *Escalera v. Coombe*, 826 F.2d 185, 189–92 (2d Cir.1987), *petition for cert. filed*, 56 U.S.L.W. 3290 (U.S. Oct. 20, 1987) (No. 87–544), where the habeas corpus petitioner challenged the preclusion, because of his failure to comply with the requirements of the notice-of-alibi statute, of his brother's corroborating alibi testimony. In *Escalera*, the court determined that

any prejudice to the prosecution was only potential and could have been alleviated by a short continuance to give the prosecutor an opportunity to examine the witness. The outcome of the case might have been affected depending on the jury's assessment of the brother's testimony. Therefore, the court concluded, the preclusion of the brother's alibi testimony violated the petitioner's right to compulsory process. *Id.* at 192. *See also Ronson v. Comm'r of Corrections*, 604 F.2d 176, 178–79 (2d Cir. 1979) (balancing test applied where witness improperly precluded). Similarly, in *United States ex rel. Enoch v. Hartigan*, 768 F.2d 161 (7th Cir.1985), *cert. denied*, 475 U.S. 1053, 106 S.Ct. 1281, 89 L.Ed.2d 588 (1986), the Seventh Circuit employed a balancing test, concluding that the state's interest in applying discovery rules was not substantial enough to override the Sixth Amendment right to present "clearly mate-

The Appellate Division affirmed petitioner's conviction without opinion. Under these circumstances, the inference is drawn that the Appellate Division's affirmance rested on the adequate and independent state procedural ground and not on the merits. *See Taylor v. Harris*, 640 F.2d 1, 2 n. 3 (2d Cir.) (per curiam), *cert. denied*, 452 U.S. 942, 101 S.Ct. 3089, 69 L.Ed.2d 958 (1981).

The Supreme Court in *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) held that a petitioner's failure to comply with a state's procedural rule for raising a federal constitutional claim is a sufficient ground to bar federal review of the claim unless the aggrieved party could show cause for his procedural default and prejudice resulting from the alleged violation. *Id.* at 86–87, 97 S.Ct. at 2506–07. *See also Martinez v. Harris*, 675 F.2d 51, 53 (2d Cir.), *cert. denied*, 459 U.S. 849, 103 S.Ct. 109, 74 L.Ed.2d 97 (1982).

Because petitioner has presented no reason at all for his failure to object to the instructions on the ground of their effect on Ms. Smith's testimony, this argument is not available to petitioner in this proceeding. However, this Court is certainly entitled to consider the effect of the instruction on Ms. Smith's testimony, along with the rest of the surrounding circumstances, in determining whether petitioner's own excluded testimony was merely cumulative, irrelevant, or otherwise inadmissible.

9. The Court rejects respondents' argument that the precluded testimony was merely cumulative of Ms. Smith's testimony. Petitioner's testimony would have corroborated Ms. Smith and may have enhanced her credibility in the eyes of the

jurors. The Court will not quickly consider corroboration of otherwise unsupported alibi testimony presented by family or friends of an accused to be cumulative. *See Escalera v. Coombe*, 826 F.2d 185, 193 (2d Cir.1987) (Precluded testimony of petitioner's brother would have corroborated petitioner's otherwise unsupported alibi. "The jury might discount the testimony of a close relative, but the possibility that [the brother's] testimony would affect the verdict is not unreasonable."), *petition for cert. filed*, 56 U.S.L.W. 3290 (U.S. Oct. 20, 1987) (No. 87–544). Especially in this case, where the ambiguous jury instructions impaired the effectiveness of Ms. Smith's testimony, the Court is loathe to characterize petitioner's precluded testimony as cumulative.

Furthermore, in this case petitioner's testimony was precluded because of the justice's erroneous application of the notice-of-alibi statute. The prosecution, then, can be considered wholly responsible for the preclusion. It occurred through no fault or neglect on the part of petitioner or his attorney. In *Singleton v. Lefkowitz, supra*, 583 F.2d 618, the precluded witness had been arrested pursuant to a material witness order, and then improperly released by the state. This Circuit held that the showing of favorable testimony required under a compulsory process claim is relaxed when the government has contributed to the unavailability of the witness. *Id.* at 623. Similarly, in this case where the state is wholly responsible for the preclusion of petitioner's testimony, he need not make so strong a showing of the favorable nature of the precluded testimony.

rial testimony." *Id.* at 163. *But see United States v. Davis,* 639 F.2d 239, 243 (5th Cir.1981) (Sixth Amendment "forbids the exclusion of otherwise admissible evidence solely as a sanction to enforce discovery rules or orders against criminal defendants.").

 In the instant case, there are no legitimate government interests to balance against petitioner's right to present his own testimony. The presiding justice at trial erroneously believed that he was compelled by the terms of the notice-of-alibi statute to disallow petitioner's testimony. The justice was mistaken in at least three respects. First, it is constitutionally impermissible to enforce a notice-of-alibi statute against a defendant by precluding his own testimony. *Alicea v. Gagnon, supra,* 675 F.2d at 923–24.[10] Second, the prosecutor's request for a list of alibi witnesses was in this case untimely, so the statute by its own terms did not apply in this case.[11] Third, even if the statute did apply on these facts and could constitutionally be applied

to petitioner's own testimony, the justice was not required, as he believed, to preclude the offered testimony, but had available the alternative remedy of granting a continuance to the prosecutor in order to alleviate any surprise or prejudice resulting from the lack of notice. N.Y.Crim. Proc.Law § 250.20(3) (McKinney 1982).[12] *See Escalera v. Coombes, supra,* 826 F.2d at 190 (any prejudice could have been alleviated by the grant of a continuance); *Ronson v. Comm'r of Corrections, supra,* 604 F.2d at 179 (same). Because there is no legitimate state interest in this case to balance against petitioner's right to testify, this Court concludes that the justice's instructions to the jury to disregard petitioner's testimony concerning his whereabouts prior to 11:00 p.m. on February 19, 1982 violated his constitutional right to testify in his own behalf.

### E. Harmless Error

 It is unclear whether a harmless error analysis is appropriate under the circumstances of this case. The Second Cir-

---

10. The court balanced the state's interests in preventing the truly guilty from escaping justice and in the orderly administration of justice against a criminal defendant's right to testify. *Alicea v. Gagnon,* 675 F.2d 913, 923–24 (7th Cir.1982). Noting that the state would normally be in a formidable position to refute unexpected alibi testimony, and that a continuance would cure any prejudice that might develop in the event the state finds its evidence significantly weakened, the court concluded that it would be illogical and impermissible to exact so great a price as preclusion of a defendant's testimony to further a rule which serves little or no purpose. *Id.* at 924–25. This Court finds the reasoning of the Seventh Circuit in *Alicea* to be persuasive and adopts it here, finding no controlling authority on this point from the Second Circuit.

In *Alicea* the court recognized that in certain situations such as a defendant's intentional suppression of alibi testimony to gain a tactical advantage, preclusion may be appropriate. *Id.* at 925. The Supreme Court recently so held in *Taylor v. Illinois,* —— U.S. ——, 108 S.Ct. 646, —— L.Ed.2d —— (1988) (Compulsory process clause does not create an absolute bar to preclusion of the testimony of a defense witness as a sanction for violating a discovery rule. If discovery violations are willful and motivated by a desire to obtain a tactical advantage or to conceal a plan to present fabricated testimony, it would be entirely appropriate to exclude the witnesses' testimony regardless of whether other, less dras-

tic sanctions might be available, adequate, and merited.).

There is, however, no suggestion in this case that the lack of notice was intentional or calculated, so *Taylor* does not apply. Moreover, respondents conceded on direct appeal that petitioner "was not obligated to list himself as a witness in any alibi notice." Respondents' Brief on Direct Appeal 15 (*citing People v. Rakiec,* 289 N.Y. 306, 45 N.E.2d 812 (1942); *People v. Cuevas,* 67 A.D.2d 219, 224, 414 N.Y.S.2d 520, 524 (1979)).

11. On direct appeal the People conceded that "the People's alibi demand was technically untimely and, when read literally, related only to the later, attempted murder incident." Respondent's Brief on Direct Appeal 15 n.

Petitioner was originally indicted solely for attempted murder, assault and criminal possession of a weapon arising out of the 11:30 incident. The People served a Voluntary Disclosure Form containing a demand for notice of alibi with regard to this incident. Subsequently, a superceding indictment was filed containing charges relating to both the 11:30 and the 9:30 incidents, and petitioner was arraigned on this superceding indictment. No new Voluntary Disclosure Form was served relating to this superceding indictment. Petitioner's Brief on Direct Appeal 13 n. 4.

12. The text of the statute is reproduced at note 6, *supra.*

cuit declined to decide the issue in the similar case of *Escalera v. Coombes, supra*, 826 F.2d 185, deciding instead that the result was the same whether or not a harmless error analysis was undertaken. *Id.* at 193.[13] The court in *Escalera* set out the appropriate inquiry for resolving a question of harmless error.

> [A]ssuming without deciding that the errors are subject to harmless error analysis, we consider whether the preclusion sanction ... was harmless beyond a reasonable doubt. We look to the " 'probable impact of the [errors] on the minds of the average jury' " to determine " 'whether there is a reasonable possibility' that the error affected the jury's verdict."

*Id.* at 193 (citations omitted). Because in this case too the same result obtains whether or not a harmless error analysis is applied, the Court will undertake a harmless error analysis without deciding that the error in question is subject to such analysis.

In *Escalera* the court determined that preclusion of the alibi testimony offered by the defendant's brother could not be considered harmless error. The brother was prepared to testify that the defendant had been at home, showering and eating, for the half hour immediately preceding the crime charged. This testimony would have corroborated the defendant's own testimony, which was otherwise unsubstantiated. Recognizing that the jury might discount the testimony of a close relative, the court nevertheless determined that there was a reasonable possibility that the brother's testimony would have affected the verdict. *Id.*

In reaching this conclusion, the *Escalera* court noted the weakness of the identification evidence in that case. *Id.* at 193–94. The reliability of the in-court identification of the defendant by two witnesses was tainted by a potentially suggestive photographic identification conducted immediately after the incident, the effect of which was not properly considered by the district court. *Id.* at 192–93.

Similarly, in the instant case, "the identification testimony was anything but solid." *See id.* at 194. There is no question here that petitioner was in fact the man taken into custody at the garage shortly after Habib was shot. The identification testimony offered by the police officers who apprehended petitioner, Tr. at 140, 292, is not disputed. The question, rather, is whether a reasonable possibility exists that the erroneous jury instruction, nullifying a portion of petitioner's testimony and compromising the force of Ms. Smith's testimony, affected the jury's determination that petitioner committed the crimes charged.

Petitioner, after being apprehended at the scene of the charged crimes, was taken to Habib, the victim, while Habib was lying on the sidewalk and before he was taken to the hospital to be treated for his wounds. Under these highly suggestive conditions, Habib was asked to identify petitioner as the perpetrator. Tr. at 314–15, 528–29. Habib's subsequent in-court identification of petitioner, Tr. at 167, is therefore of questionable reliability.[14]

The descriptions provided at the scene by both Habib and Bernard, a witness to the second incident, were vague and general. The lighting on the ground floor of the

---

**13.** The Seventh Circuit applied a harmless error analysis in *Alicea v. Gagnon, supra,* 675 F.2d at 925, and determined that the trial court's exclusion of the defendant's own alibi testimony, though constitutional error, was harmless because the evidence against him was overwhelming, and because the testimony was introduced in spite of the judge's preclusive ruling. *Id. But see United States v. Butts,* 630 F.Supp. 1145, 1148 (D.Me.1986) ("This Court considers a defendant's right to testify in a criminal proceeding against him so basic to a fair trial that its infraction can never be treated as harmless error....").

**14.** The suggestiveness of the on-the-scene identification and the absence of a *Wade* hearing on the issue is not before the Court as an asserted violation of petitioner's right to due process. Such a claim was not exhausted in state court, and was not put forward in the petition. The Court, though, may properly consider the suggestiveness of the on-the-scene identification, along with all other surrounding circumstances, when assessing whether the nullifying instruction constituted harmless error.

garage, where the events in question took place, was "vague[ ]." Tr. at 114, 128. Habib testified that the hood of the robber's jacket "was up over his head" and "the jacket was closed." Tr. at 167–68. Bernard, who had not even witnessed the 9:30 incident, was able to describe Habib's assailant in only vague and general terms. Bernard testified that the assailant was dark skinned, with a beard and a hooded, thick "fur" coat. The coat was further described as being "white, with like a brownish-beige." Tr. at 57–58.[15] On cross-examination, Bernard admitted that he could not see the assailant's face during the attack. Tr. at 68. He was unable to identify petitioner in court. Tr. at 47–48. After being shown a photograph of petitioner, Bernard identified the photograph as the man who was taken into custody. Tr. at 64.[16] The manifold weaknesses in the identification testimony in this case are apparent.

The instant case is strikingly different from *Alicea v. Gagnon, supra,* 675 F.2d 913, where the court determined that the preclusion of the defendant's own alibi testimony amounted to only harmless error. The court provided two reasons to support its conclusion. First, the evidence linking the defendant to the crime was overwhelming. Second and more importantly, the defendant was able to present his alibi testimony in spite of the preclusive ruling. *Id.* at 925. Neither of these reasons can apply to the instant case to support a conclusion of harmless error.

In *Alicea* the defendant's green Ford Mustang with its damaged hood and missing grill was positively identified as the car used in the robbery. *Id.* at 915, 925. The robber had worn coveralls, yellow gloves, and a green and red ski mask, identical to those owned by the defendant and found under his car. *Id.* Furthermore, the rob-

ber had the defendant's unusual muscular build. *Id.* at 925.

For the jury to find petitioner innocent under these circumstances, it would have had to conclude that either someone built just like Alicea stole Alicea's clothes and car and then committed a robbery or that the robber's physique as well as taste in clothing and cars were remarkably similar to Alicea's. We think it impossible that a jury would believe such strange misfortunes (or coincidences) could befall any man.

*Id.* In the instant case, by contrast, this Court considers it quite possible that the jury could believe that two dark-skinned men, each wearing a heavy fur or sheepskin coat might cross paths on a cold February night in the vicinity of Irving Place and Sixteenth Street.

Furthermore, in *Alicea,* the defendant was permitted to testify, in spite of the ruling precluding his alibi testimony, that he had been at home on the morning of the robbery. In his offer of proof after the remainder of the alibi testimony was excluded, the defendant merely sought to repeat that he was at home and had received telephone calls at about the time the robbery took place. *Id.* In the instant case, the instructions to the jury to disregard Walker's alibi testimony prevented its proper consideration by the jury. Thus, neither of the reasons that led the *Alicea* court to conclude that the exclusion of the alibi testimony was harmless is available to support a similar conclusion in the instant case.

Respondents argue that the preclusion of petitioner's alibi testimony must be considered harmless in light of additional evidence linking petitioner to the crime. Specifically, Habib and Bernard testified that a gun, which an arresting officer testified had been taken from petitioner at his ar-

---

**15.** On the night of his arrest, petitioner was in fact wearing a sheepskin jacket with fleece lining, not a fur coat. This discrepancy may be viewed simply as a question of semantics, but when the identification depends so heavily on the witnesses' description of the perpetrator's clothing, the Court believes this discrepancy is worth noting.

**16.** The Court's discussion here of the in-court photographic show-up in its consideration of whether the nullifying instruction was a harmless error is not to be construed as any holding on the issue whether the photo show-up itself violated petitioner's right to due process.

rest, appeared similar to the one used in the robberies. Petitioner, though, testified that he did not have any type of a gun on him that night. Furthermore, it does not appear unlikely that to a victim of violent crime, *any* gun might appear to be similar to the one used against him. One of the arresting officers testified that he removed a white glove from petitioner's hand and a second glove from the garage floor. Tr. at 316. This evidence does not persuasively link petitioner to the crime since petitioner does not deny his presence in the garage. Respondents also argue that money found on petitioner at his arrest corresponded closely, in amount and denomination, to the money taken from Habib in the first robbery. The Court notes, however, that this money was not presented as evidence at trial, and the mere presence of pocket money on petitioner does not appear to be a strong link to the crime. Taking all the foregoing factors into consideration, the Court concludes that there is indeed a reasonable possibility that the preclusion of petitioner's testimony affected the jury's verdict. Accordingly, the Court holds that the preclusion was not harmless error.

## CONCLUSION

The Court concludes that the erroneous jury instruction deprived petitioner of his constitutional right to testify on his own behalf. Accordingly, the People are directed to grant petitioner a new trial within sixty days. Should the People elect not to re-try petitioner, then the Court will grant on April 11, 1988 his petition for a writ of habeas corpus.

Because of the Court's resolution of the first ground raised in the petition, it need not address the additional grounds raised by petitioner.

It is so ordered.